No. 36,315

F. H. FREETO, *Appellant,* v. THE STATE HIGHWAY COMMISSION, etc., *Appellee.*

E. W. GEIGER, Sole Surviving Partner of GEIGER AND RUTHERFORD, and OLIVE MALL RUTHERFORD, Executrix of the Estate of C. C. Rutherford, *Appellants,* v. THE STATE HIGHWAY COMMISSION, etc., *Appellee.*

C. A. TUCKER and C. J. McCOY, *Appellants,* v. THE STATE HIGHWAY COMMISSION, etc., *Appellee.*

S. H. RENO, *Appellant,* v. THE STATE HIGHWAY COMMISSION, etc., *Appellee.*

HARRY J. TAYLOR, *Appellant,* v. THE STATE HIGHWAY COMMISSION, etc., *Appellee.*

GEORGE BENNETT, *Appellant,* v. THE STATE HIGHWAY COMMISSION, etc., *Appellee.*

LIST AND CLARK CONSTRUCTION COMPANY, *Appellant,* v. THE STATE HIGHWAY COMMISSION, etc., *Appellee.*

D. G. Hansen, *Appellant*, v. The State Highway Commission, etc., *Appellee*.

Sarah H. Cook and C. A. Tucker, Partners, doing business as Cook and Tucker, and C. J. McCoy, *Appellants*, v. The State Highway Commission, etc., *Appellee*.

Lloyd K. Jones, *Appellant*, v. The State Highway Commission, etc., *Appellee*.

Grant A. Stannard and Otis McGeorge, doing business as Stannard Construction Company, *Appellants*, v. The State Highway Commission, etc., *Appellee*.

Charles Hulme, *Appellant*, v. The State Highway Commission, etc., *Appellee*.

J. H. Rhoades, R. H. Rhoades and C. M. Rhoades, Partners doing business as Rhoades Construction Company, *Appellants*, v. The State Highway Commission, etc., *Appellee*.

(166 P. 2d 728)

Opinion filed March 9, 1946.

*E. H. Hatcher,* of Topeka, argued the cause, and *Barton E. Griffith,* of Topeka, and *Lee Bond,* of Leavenworth, were on the briefs for the appellants.

*Kirke W. Dale,* of Arkansas City, argued the cause, and *Otho W. Lomax,* of Topeka, *Albert Faulconer, Donald Hickman,* both of Arkansas City, and *Eldon Wallingford,* of New York, N. Y., were on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: F. H. Freeto, a highway construction contractor, and twelve other persons, firms, or corporations engaged in the same business, each having previously entered into one or more contracts with the state highway commission (hereinafter called the commission) for the construction of one or more highway projects, brought separate actions in equity against the commission in the district court of Shawnee county to have the contracts cancelled on the ground of impossibility of performance. In the thirteen actions the plaintiffs sought cancellation of twenty-seven contracts involving highway projects, the contract cost for which aggregated about $1,600,000. Some of the actions were filed January 19, 1944, and others on various dates to March 10, 1944. As filed, some of the cases were assigned to each of the three divisions of the court. After issues were joined by pleadings filed the actions were consolidated for the purpose of trial and were tried before the three judges of the three divisions of the court sitting *en banc,* and counsel stipulated "that all evidence offered may be considered where competent, in each of the cases." The trial was had and plaintiffs' evidence introduced October 12 to 19, 1944. At the close of the evidence on behalf of plaintiffs defendant demurred "to the evidence in every case, for the reason that the evidence adduced fails to establish or prove a cause of action in favor of the plaintiffs or any of them and against this defendant under the issues joined in each and every case herein." After con-

sidering the evidence and the argument of counsel on the demurrer the court sustained the demurrer and each judge made the proper order in the case pending in his division. Plaintiffs promptly appealed to this court from the order sustaining defendant's demurrer to the evidence. In this court the entire proceedings were filed as one case and abstracted and briefed together.

Appellants point to our well-established rule that in considering defendant's demurrer to plaintiffs evidence the court cannot weigh the evidence, but must consider it in the light most favorable to plaintiffs. (See *Zumbrun v. City of Osawatomie,* 130 Kan. 719, 721, 288 Pac. 584; *In re Estate of Bond,* 158 Kan. 776, 150 P. 2d 343, and cases cited therein.) This requires us to summarize the pleadings and the evidence.

The petition in the case of *Freeto v. The Commission,* after identifying the parties and their functions, alleged that on May 14, 1941, plaintiff entered into two contracts (tied together) with defendant for the construction of two bridges in Neosho county, known as Project No. 39-67 FA 567, section A (1), which contract incorporated by reference and made a part thereof the standard specifications for state road and bridge construction (printed in book form and too bulky to attach), plaintiff's proposals, schedule of prices, and the bonds. These were attached as exhibits. That the work order was issued January 19, 1942; that plaintiff started work on the project, completed the piers and abutments, and had received the reinforcing steel when he was forced to cease work on the project and has been unable to continue due to the participation of the United States in the present World War. The causes arising from war conditions which made the continuance of the contracts impossible were alleged to be: (1) The refusal of the federal government to permit steel companies to ship structural steel needed for the completion of the project because its use was necessary for war purposes, and that it is impossible to foresee when structural steel will be available. (2) The War Production Board placed a stop order on the project December 24, 1942, requiring cessation of further work. (3) Plaintiff was informed by army officials, through his agent, J. W. Ballard, secretary of the Kansas Contractors Association, that unless equipment was made available for war projects, such equipment would be taken under authority of U. S. C. A., Title 50, section 721, and made available for government use. (4) The priorities for highway construction

were not sufficient to enable plaintiff to obtain repairs for equipment even though it were available. (5) Labor has been withdrawn from highway construction to work on war projects and is not and cannot be made available. That because of such conditions plaintiff is unable to continue the work on the project and that it cannot be foreseen when, if ever, he will be able to do so; that if at some future date he might be able to complete the work, conditions have so changed that the work could not be completed under the terms and conditions the contracting parties had in mind when the contracts were made; that the contracts provided for a limited time for completion, which time has long since expired, but defendant has failed and refused to cancel the contracts and plaintiff is being hampered and damaged in the conduct of his business by reason thereof. The prayer was for a decree that the contracts are no longer in force and an order that the defendant cancel the same, that an accounting be had for the work done, and for such other relief as the court finds just and equitable.

Attached to the petition as exhibit "B" is a copy of plaintiff's proposal for a contract for the construction of one of the bridges, which reads:

"PIN CHECK HERE
STATE HIGHWAY COMMISSION OF KANSAS
PROPOSAL

"1. Proposal of F. H. Freeto for the construction and improving of Project No. 39-67 FA 567 A (1) in Neosho county, state of Kansas, by the construction of the work as shown by the plans, drawings and specifications for the above-mentioned project as set forth in the schedule of prices.

"2. All work to comply with the Standard Specifications for State Road and Bridge Construction, Edition 1937, and printed pamphlet of Supplemental Specifications dated April 1, 1939, of the State Highway Commission of Kansas.

"*To the State Highway Commission:*

"3. The undersigned agrees to execute a contract for the proposed work within ten (10) days after the date of the award of the contract and to begin work within ten (10) calendar days of the date stated in the work order and to complete the work, if this proposal is accepted" on the several portions of the project within a stated number of working days. There is the further statement that the proposal is tied with the proposal of the same submitted upon the construction of the other bridge, and that plaintiff would not accept one unless awarded the other. It further recites:

"5. In submitting this bid the undersigned declares that he is the only person interested in the said bid; that it is made without any connection with

any person or persons making another bid for the same contract; that the bid is in all respects fair and without collusion, fraud or misrepresentation.

"6. The undersigned further declares that he has carefully examined the plans, specifications, form of contract and special provisions, if any, and that he has inspected the actual location of the work, together with the local sources of supplies, and has satisfied himself as to all quantities and conditions, and understands that in signing this proposal he waives all right to plead any misunderstanding regarding the same."

Attached to the proposal was a schedule of prices which showed the unit price on the various types of work to be done and the gross price for each type of work, aggregating $10,740.78 for one of the bridges.

There was set out as exhibit "A" to the petition the contract between plaintiff and the commission, properly executed, the pertinent portions of which read:

"CONTRACT

"For the work as provided for in the plans and specifications and named or numbered and described in the advertisement and proposal forming a part of this contract, and attached thereto, all of which are hereby made a part of this contract.

"*This Agreement,* Entered into this 14th day of May, 1941, by and between the State Highway Commission of Kansas, party of the first part, and F. H. Freeto, Pittsburg, Kansas, his heirs, executors, administrators, successors, or assigns, known as the party of the second part, for the construction of the following described work: Bridge . . . known as Project No. 39-67 FA 567, section A (1) . . .

"*Witnesseth,* That for and in consideration of the payments and agreements mentioned in the proposal, hereto attached, to be made and performed by the party of the first part, and according to the terms, expressed in the bonds referring to these presents, the party of the second part agrees with said party of the first part at his own proper cost and expense to do all the work, furnish all materials and labor necessary to do the work in accordance with the plans and specifications herein described, and in full compliance with all the terms of this agreement and the requirements of the engineer under it.

"It is also understood and agreed that the advertisement, proposal bond, specifications and plans hereto attached, or hereinbefore referred to are all essential documents of this contract and are a part hereof. . . ."

Attached to the petition as exhibit "D" was a copy of the contract bond executed by F. H. Freeto as principal and Central Surety and Insurance Corporation as surety in the penal sum of the amount of the contract. It identified the project and was conditioned for the faithful performance of the contract by the principal within the time mentioned in the contract, "or within any additional time granted by the State Highway Commission of Kansas," and to compensate defendant for any and all loss, cost, damages or

expense which it may suffer or be held responsible for by reason of the negligence, defective condition, default, failure or miscarriage in the performance of said contract, "whether by said principal, subcontractor or otherwise, . . ." There were also attached as exhibits a similar proposal, schedule of prices aggregating $35,309.69, contract and bond for the other bridge, a part of the same project.

The Standard Specifications for State Road and Bridge Construction, made a part of the contract, a printed copy of which was filed with the petition in the trial court, defines many terms used therein, among others the following:

"1.25 WORKING DAY—A working day shall be any day upon which the Contractor can physically and legally prosecute the work. . . .

"1.27 CONSTRUCTION WORK ORDER—A written notice from the Engineer notifying the Contractor of the date on which he may begin the prosecution of the work for which he has contracted."

It contained many provisions pertaining to the duties and obligations of the parties to the contract, designed for clarity of understanding and for coöperation between them. Those most pertinent here are quoted or the substance stated, as follows:

"2.4 FAMILIARITY WITH LAWS AND ORDINANCES—The bidder by submitting a proposal agrees that he has familiarized himself with all requirements of Federal, State, County or Municipal Laws and ordinances applying to the work in hand before submitting a bid. . . .

"5.1 AUTHORITY OF ENGINEER—The Engineer shall decide any and all questions which may arise as to the quality and acceptability of materials furnished and work performed and as to the manner of performance and rate of progress of the work, and shall decide all questions which may arise as to the interpretation of the Plans and Specifications, and all questions as to the acceptable fulfillment of the terms of the contract. Such decisions by the Engineer shall be final and binding upon the Contractor.

"7.1 LAWS TO BE OBSERVED—The Contractor is assumed to be familiar with and at all times shall observe and comply with all Federal and State Laws, and local bylaws, ordinances, and regulations in any manner affecting the conduct of the work, and all such orders or decrees as exist at present, and those which may be enacted later, or bodies or tribunals having jurisdiction or authority over the work, and shall indemnify and save harmless the Commission and all its officers, agents, and servants against any claim or liability from or based on the violation of any such law, bylaw, ordinance, regulation, order or decree, whether by himself or his employees."

7.5 authorizes the use of the specifications for Federal Aid Projects and in substance provides that where federal aid is furnished on a project the construction work from each state shall be done in accordance with its laws and under the direct supervision of

the state highway department, subject to inspection and approval of the Secretary of Agriculture. In the trial court it was made clear that all of the projects involved in the actions before the court were federal aid projects, and that not only the work performed but the contracts should meet with the approval of the Secretary of Agriculture of the United States or his agents.

7.13 reads in part:

"The Contractor shall be held responsible for the care and maintenance of partially completed work and finished work on any portion of the road until approval of that portion by the Engineer. . . .

"8.2 PROSECUTION OF WORK—The work shall begin on or within ten (10) days after the date stated in the work order and shall be diligently prosecuted at such a rate and in such manner as in the opinion of the Engineer is necessary for completion within the number of working days set out in the proposal.

"The Contractor shall notify the Resident Engineer in writing immediately after the receipt of the work order of the date he expects to begin work, and shall also notify the Resident Engineer in writing of the time the work is ready for final inspection. Should the prosecution of the work for any reason be discontinued by the Contractor, with the consent of the Resident Engineer, he shall notify the Resident Engineer at least twenty-four (24) hours before again commencing operations. . . .

"8.5 TEMPORARY SUSPENSION OF WORK—The Engineer shall have the authority to suspend the work wholly or in part, for such period or periods as he may deem necessary, due to unsuitable weather or such other conditions of the work, or for such time as is necessarily due to the failure on the part of the Contractor to carry out orders given or to perform any or all provisions of the contract. If it should become necessary to stop work for an indefinite period, the Contractor shall store all materials in such manner that they will not obstruct or impede the traveling public unnecessarily nor become damaged in any way, and he shall take every precaution to prevent damage or deterioration of the work performed, erect temporary structures where necessary, and provide suitable drainage of the roadway by opening ditches, shoulder drains, etc. The Contractor shall not suspend work without written authority.

"8.6 DETERMINATION OF TIME ALLOWABLE FOR COMPLETING THE WORK— The time for completion of the work, in working days, will be specified in the proposal and the completion of the work within the time specified is an essential part of the contract.

"The contract time shall start ten (10) calendar days after the date stated in the work order.

"In computing the number of working days allowable under the contract allowance will be made for all days during which prosecution of the work has been delayed by unsuitable weather conditions, storms, acts of Providence, acts or omissions of the Commission or Engineer not the fault of the Contractor, or by other causes entirely beyond his control. Sundays shall not be computed

as working days. Legal holidays shall not be computed as working days unless the Contractor chooses to work. . . .

"On days not considered as working days by the Engineer, no time will be charged against the contract for miscellaneous work performed providing the working force does not represent in numbers more than twenty (20) percent of the normal working force employed on the project at that time."

8.8 provides in substance that if the contractor fails to begin the work within the time specified, or to carry on the work in an acceptable manner, the engineer shall give notice in writing to the contractor and his surety of such default, specifying the same, and upon the written certificate of the engineer the commission shall have power and authority to take the prosecution of the work out of the hands of the contractor, appropriate or use suitable materials and equipment on the ground, and may enter into an agreement for the completion of the contract according to its terms, or such other method as in the commission's opinion shall be required for the completion of the contract in an acceptable manner; and that the cost incurred by the commission in doing so shall be deducted from any moneys due or to become due to the contractor, and if that be insufficient then the contractor and the surety shall be liable for the excess; or that it may demand the contractor's surety to proceed in place of the contractor to complete the contract in accordance with its terms.

"8.9 TERMINATION OF CONTRACTOR'S RESPONSIBILITY—The contract shall be considered complete when all work has been completed and accepted by the Engineer and final estimate paid. The Contractor will then be released from further obligation except as set forth in the Contractor's Bond."

Also attached to the petition addressed to the commission was Preference Rating Order No. P-19A Builders Serial No. 991-A, executed by Donald M. Nelson, Director of Priorities of the federal government, dated September 23, 1941, to expire June 30, 1942, unless sooner revoked. This pertains to priorities on projects for the construction of Federal Aid System of Highways, identified by certain project numbers, including 39-67-FA 567-A (1); also the order by the same authority issued October 18, 1941, limiting Preference Rating Order No. P-19-e and given a serial No. 504-E (replacing P-19A 991-A and 992-A); and an order, dated August 18, 1942, extending Order No. 504-E as Preference Rating Order No. P-19-e, to expire June 30, 1943; also copy of an order, dated December 24, 1942, of revocation of Preference Rating Order P-19-e, Serial No. 504-E, which identified this project by number, prohibiting further con-

struction, but providing for an application for exceptions. This last is spoken of as the stop order.

Plaintiff also attached as an exhibit to his petition a copy of a letter, dated November 16, 1943, written by Edward W. Franzke, Acting State War Man Power Director, to J. W. Ballard, Secretary State Contractors Association, pertaining to the availability of men for employment in road construction work.

Defendant filed an answer which contained a general denial of the allegations of the petition except those later admitted, modified or explained. It admitted the allegations of the petition, described the parties and their functions and the facts pertaining to the execution of the contract for the projects in question. It admitted the agency of J. W. Ballard for plaintiff, as alleged in the petition, but denied any knowledge of the further allegations of grounds for the cancellation of the contract, as alleged in the petition. The answer admitted that defendant has refused to cancel the contract, also admitted that work orders were submitted, but alleged that they were issued on June 14, 1941; that plaintiff commenced work on the bridges on June 17, 1941; that had plaintiff ordered the structural steel for the bridges within a reasonable time after either date the same could have been secured; that plaintiff failed and neglected to order such material within a reasonable time, and that he stopped work on one of the bridges on October 11, 1941, and on the other bridge on December 6, 1941, and that since those dates no "working days" under the contract had been counted against the plaintiff.

It was specifically denied that the "contracts provide for a limited time for completion," and also that the "completion time has long since expired," and it was alleged that the contracts do not provide a specific time either for the commencement of the work or the completion thereof; that the contracts provide the work shall commence within ten days from the dates specified in the "work order," but are silent as to the time when the "work order" shall be issued; that the contracts provide the work shall be completed within a specific number of "working days," but that no days shall be counted as "working days" unless they are days "upon which the contractor can physically and legally prosecute the work." It was alleged that this policy and practice were well known to plaintiff and his agent, J. W. Ballard, and by contractors in general and defendant's agents, engineers and employees; that the contracts were drawn so this practice and policy might be carried out for the mu-

tual convenience of the parties; that defendant has fostered competitive bidding by doing everything practically possible to make the highway construction work convenient, fair and profitable to contractors and in accord with such policy it is defendant's practice to divide major highway projects into parts, classifications and sections, letting separate contracts for each in order that contractors may bid and obtain contracts for different types of work and undertake either a large or small portion thereof; that in order to receive federal aid the contractor must receive concurrence of the Public Road Administration; that in many cases right of way must be obtained and other preliminary work done before the work undertaken by the contractor is commenced; that, excepting emergency work, all highway work is done under definite plans, carefully prepared and fitted into long-range plans for highway development; that the plans bid upon by contractors must be and are subject to change to meet unforeseen contingencies; that quantities bid upon are based on estimates; that physical conditions in the field, future weather conditions, accidents, litigation and availability and prices of labor and material are all subject to conjecture, but no work is contemplated or required to be done except at a propitious time therefor, considering such unforeseen contingencies and the commitments of the contractors; that this policy requires contracts for work to be long in advance to enable contractors to plan their work, thereby keeping their equipment and organizations properly employed, and that plaintiff was familiar with all of these matters at all times stated in the petition. It was further alleged that when the contracts were entered into the parties were cognizant of the fact that the world had become embroiled in war and that participation of the United States in such conflict was a matter to be expected, and that the contracts were entered into in contemplation of events reasonably to be expected in regard to economic conditions and governmental regulations reasonably to be expected. It was further alleged that defendant has not and does not intend to claim that any default in the performance of the contract exists on the part of the plaintiff as long as plaintiff cannot "physically and legally prosecute the work."

The reply was a general denial of all new matter stated in the answer and of all allegations contradictory to the allegations of the petition.

The pleadings in each of the other cases follow the same pattern.

as those in the Freeto case, differing only in the parties, the projects, and other matters peculiar to their respective contracts, which so far as material are stated under the heading of the respective cases. In each case the basic grounds upon which the several plaintiffs seek to have their respective contracts cancelled are the same as those alleged in the Freeto case, except as to those contracts upon which work was never started there is added the ground that no work order was given.

The testimony consisted of what was spoken of as general witnesses, followed by the testimony of one or more witnesses for plaintiff in each of the cases.

The principal general witness was J. W. Ballard of Topeka. He was graduated as an engineer from Kansas State College in 1926, and immediately employed by the commission as district engineer of the Manhattan district, which includes the counties of Riley, Geary and Pottawatomie, where he supervised all types of highway construction in those counties. On April 1, 1930, he took the position as secretary of the Kansas State Contractors Association, which position he has continued to hold. This is a chapter of the Associated General Contractors of America, which has headquarters in New York. It was organized in 1918 to study questions affecting contracts arising out of the World War, and has been continued since. Its function is to keep advised of matters here and abroad which are of special interest to contractors, or particularly affecting them, in the making or performance of contracts, including acts of Congress and of government officials. It publishes The Constructor, a monthly magazine in which articles and editorials on those subjects are printed and which is sent to contractors. It keeps the witness informed of what is going on in Washington of interest to contractors, and the witness discussed these matters with the various contractors. The national association had a meeting in Indianapolis in 1939 at which attention was given to the turbulent conditions in Europe, including the war, the possibility that we would be drawn into it, and the ways in which that might affect contractors, and also considered the advisability of a provision being inserted in contracts in which the Federal government was interested providing for paying the difference in cost of labor and materials after the contracts were let. A committee was appointed to endeavor to get such a clause inserted in such contracts. The committee took the matter up with the proper officials at Wash-

ington. The idea was turned down by the Comptroller of the Currency. State officials generally throughout the country authorized to build highways also refused to insert such a clause. In 1940 the witness took the matter up with Mr. D. J. Fair, director of the commission. Mr. Fair said he was willing to go along on increased labor cost, but it was impossible to determine what the increase in materials would be. Nothing was done about it. No such clause was inserted in any of the contracts here involved. These contracts are the same form as those used for many years. Other meetings were held by the national association, at least one at Indianapolis in 1940 and one in Kansas City. Reports of these meetings were published in the magazine. The witness attended some of the meetings—not all of them. He read reports of these meetings published in the magazines, but did not read the editorials. The witness is the agent of the contractors and in that capacity keeps track of construction jobs coming up, informs contractors of the rules, regulations and policy of awarding the contracts, works with contractors on details of plans and specifications and problems coming up on the job during the progress of the work. He sometimes acts under a power of attorney (required by the Commission for such purposes) in submitting bids and making contracts on behalf of the contractors, and did so in at least two of the cases before us. The commission's method of letting contracts is to have its engineers prepare plans and specifications. The project is then advertised for three weeks for bids. Contractors desiring to bid submit proposals on forms prepared by the commission, which proposal embodies the bid the contractors make for the work. Thereafter the commission opens the bids, examines them, tabulates prices, determines who is the low bidder, and awards the contract. The contractor, when notified he is awarded the contract, has ten days in which to execute the contract and furnish a surety company bond for its faithful performance and the payment of labor and materials. Highway construction contracts, generally speaking, fall into three classes: Grading, which includes culverts, defined as bridges not more than twenty feet wide; surfacing, which may be concrete or other surfacing, and bridges. There is a distinction as to types of material going into these different types of construction. Naturally, a grading job must be done before the surfacing, and at times it is necessary that the nearby grading work be done before bridges are constructed. Since these contracts were let there

has been a decided increase in the cost of construction. Labor began to get scarce in 1942, more critical in 1943, and was impossible to get at the time of the trial. Beginning July 1, 1944, the highway contractors had to secure labor through the United States Employment Service, which would not refer a man to highway projects. To complete the contracts involved would require a thousand men, using 676,000 man hours. In November, 1943, the witness wrote a letter to Mr. Franzke, in charge of the United States Employment Service, asking how many men could be furnished. He received an answer, in which he was advised the labor could not be furnished at that time. The witness further testified that the defense program was started in the early summer of 1940; that the selective service act was passed that year; that the priority system was set up before any of these contracts was let; that in 1941 the contractors were facing conditions which in 1939 they thought might exist; that early in 1941 the Kansas Contractors Association tried to find what priorities would be given, and after September 2, 1941, defendant could advise contractors of the priorities of various projects; that in July, 1942, the government made a new list of priority rates on materials, placing the priority for government work at the head, before road contracts. After the war projects started in 1942 the witness was ordered by army engineers to secure contracts and equipment for war projects. In February, 1942, there was a national meeting of the contractors in Indianapolis, which the witness attended, where General Rybold informed the contractors that a large program of airports must be built and that he wanted highway contractors to get on the work. The witness came back to Kansas City and got in touch with the army engineers. He had been informed at the meeting that a law had been passed whereby equipment could be taken for war work, and that an attempt would be made to have the contractors make their equipment available, and if they did not do so the government would take it; that he conveyed this information to the contractors. Those who had pending highway contracts wanted to know if they could go ahead and finish them. The witness told them he did not know, but had been informed that the army would get enough equipment to build the projects, and if they were not able to do so they would probably requisition it. The witness was called to Kansas City on every war project let in Kansas and requested to locate equipment. Many federal projects were involved for which highway construc-

tion equipment was required. There was no other equipment available. Before the war highway construction in Kansas varied from ten to fifteen million dollars per year. New equipment for highway construction could not be secured after June, 1942, nor at the time of trial. The equipment used on war projects was in service twenty-four hours a day, regardless of the weather. Some repairs have not been obtainable, and the equipment is not in shape to do effective work. Equipment was allocated, three-fourths for government projects and one-fourth for other projects. The contractors got repairs for their equipment on war work, although there were delays on some parts. Before the allocation was made the commission assisted contractors in getting many repairs for highway equipment, but this ended in 1942. The witness did not learn what prices were paid for government work. The government did not put that out; the contracts were subject to renegotiation. The witness kept himself informed as best he could of conditions, the inventories, and the plans of the Commission. The witness supposed that one reason for having highway construction done by contractors was to determine in advance the cost of the work, and felt contractors could do the work cheaper than the state. There is always an element of risk in any construction contract. The contractor takes the risk, based on his experience in what he can see will happen in the future. Work orders are delayed, if possible, to accommodate the contractor. The only time he had known of work orders being delayed more than 90 days was where something else had to be done before the contractors could get to work on it, such as grading.

Charles A. Pine was chief of the Kansas City Division of United States Engineering Department since December 5, 1942, and prior thereto had been the assistant from the organization of the department on December 16, 1941. His duties in connection with the government defense projects began after the plans and specifications had been prepared, and then it was to get contractors and material to do the work. In Kansas the construction projects were in excess of $350,000,000. There were about thirty locations, of which eighteen were principal airports. The type of work to be done was largely grading and surfacing with cement. About the only equipment available and contractors familiar with the work were the equipment used and contractors engaged in highway construction work. His method was to contact contractors

through their agents in Kansas, Missouri and surrounding states and urge them to bid on the contracts. Some construction had been started in 1940; more of it was started in 1942. The work reached its peak late in 1942, but continued well into 1943 in large volume. "Considerable persuasion and solicitation was made where contractors were available. We talked to them and urged them to make their equipment available . . . there was an intimation made that if they didn't make it available it would be requisitioned." No highway equipment was requisitioned in Kansas or Missouri. He thought it possible to get equipment at the time of the trial, but difficult to get. There was difficulty in getting repairs for the equipment. When the contracts for this work were first let it was by competitive bidding; later the contracts were made directly by the Secretary of War. When equipment was first moved onto a government job it was retained as long as the government had use for it, either on that job or upon another one. Sometimes it was held idle with the expectation it would be used later.

Arthur F. Luder of Kansas City was machinery specialist for the War Production Board from August, 1942, to July 1, 1944. His duty was to make a record of equipment of contractors for states, counties and municipalities in the four states of Kansas, Missouri, Nebraska, and Arkansas. He procured a complete list of that machinery and what work it was on, or whether it was idle. If he got calls from the War Department or United States engineers or contractors doing war work he would refer them to idle machinery and suggest to the owner that he make a deal for the sale or rental of the equipment. He would call the contractors or wire them—did not know whether he did so with any of the contractors named in these actions. In 1943 he attended a contractors convention in Kansas City and suggested that they put their machinery on critical work or it might be requisitioned. When machinery was on a government job it could not be removed without permission of the engineer in charge. He thought at the time of the trial that it would not be possible for contractors to replace machinery. On spare parts seventy-five percent was allocated to use on government contracts and twenty-five percent for civilian use. That was about the middle of 1942. It has been difficult to get repairs.

E. W. Franzke of Topeka testified he was War Man Power Director for Kansas, had been since October, 1943, and prior thereto

was director of the State Employment Service. His job was to recruit, place, train and utilize the labor supply. In 1942 the labor supply first became short, and became so critical in 1943 that the employment stabilizing program was set up to discourage migration of labor and to hold those employed on essential jobs. They were not permitted to leave without a release. If one left without a release he was not considered available for reëmployment in essential work for sixty days. State, municipal and agricultural employment were excepted from the program. It applied to a list of thirty-five essential industries. Under this program a man working, say for Mr. Reno or Mr. Hulme in 1942, had to have a clearance before he could go to another job in work classed as essential. The program in the main was voluntary. In the fall of 1943 additional control measures were added, but not immediately applied in Kansas, since Kansas was considered a labor-supply state. It became more critical in 1944 when the program became coöperative, whereas prior thereto it was voluntary. In November, 1943, he received a letter from Mr. J. W. Ballard asking if his office could furnish a thousand men for highway projects in Kansas. The witness understood the inquiry was to determine whether or not that many men would be available for highway contractors; it was not a definite order for any number of men for a specific project. The witness knew Mr. Ballard was trying to get an official expression from him to be used in this litigation, but did not know that a copy of this letter was to be set up as an exhibit to each of the petitions. The witness' letter advised that there were higher priority demands on available labor which could not at that time be met within the state or in this region, including Missouri, Oklahoma and Arkansas, to which was added outside employers such as the Kaiser Ship Building Corporation, the Hanford Engineering Company, and other producers of essential war materials being included in Kansas on a continuous schedule; that the specific monthly quotas set up for each of these employers were not being met; that less than fifty percent of the quotas were being reached monthly; that due to the low priority rating of state highway projects the War Man Power Commission could not guarantee the supply in labor for those projects.

The testimony in individual cases was as follows:

The plaintiff, Frank H. Freeto of Pittsburg, who had been in the contracting business twenty-four years, testified to the making of

the contract as alleged in the petition; that the materials required were reinforcing steel, structural steel, cement, stone and sand; that on May 6, 1941, he ordered the structural steel for the two bridges, but the structural steel was never delivered. While the grading was under another contract and was not completed until 1942, it had been completed at the bridge site, so plaintiff could proceed with the bridges. Work was started June 14, 1942. The reinforcing steel was received and the abutments and piers were completed ready for the structural steel. A stop order was placed on the projects December 24, 1942, which had not been lifted at the time of the trial. At that time plaintiff did not have his organization to complete the work—the men were in the armed services or on defense jobs and there was insufficient common labor. When the contracts were taken plaintiff anticipated completing them in about seven months. He would not have taken the contract if he had known it was going to be two or three or four years before it could be completed. The bids submitted show the number of working days in the proposal, and plaintiff had estimated that he would start within a reasonable time. On June 13, 1941, plaintiff received a letter from the Inland Steel Corporation advising him that dates of delivery of the structural steel were not assured because "highway bridges as yet have no standing whatever on a preference basis." He was running into priorities within a month after the contract had been executed. It is the practice among contractors to loan equipment to each other on a rental basis, if it is available. One of the bridges was about 38.6 percent and the other about 30 percent completed and he had been paid 95 percent of the engineer's estimate on both jobs. Plaintiff did some defense jobs. On April 2, 1943, plaintiff wrote defendant:

"We have been ready to complete these jobs at any time and did not leave the State or Federal work we had under contract to proceed with defense jobs at higher prices. All jobs that were possible to complete, we completed. We do not feel that we should be held to complete a job that should have been completed over a year ago and may not be possible to finish for two or three years. We therefore respectfully ask final estimate for the substructures of both bridges."

What he intended to convey was that he had equipment for these jobs, and also had government work. Plaintiff completed two large bridges in Cherokee county and one in Bourbon county in July and August of 1942, and got the structural steel for those bridges, but had some trouble with labor. He was not sure whether he had the

same priority on those bridges as for the bridges in Neosho county; neither was he sure whether the delivery of structural steel depended upon the number of orders the fabricator had at the time the order was presented to him.

In *Geiger v. The Commission* plaintiffs seek cancellation of three contracts executed September 12, 1941, for the building of three bridges in Miami county, briefly referred to in the testimony as bridges Nos. 10.1, 10.4 and 10.9. It was alleged that work orders were issued for bridge 10.4 December 17, 1941; for bridge 10.9 January 10, 1942, and for 10.1 February 25, 1942; that plaintiffs started work on each of the bridges on the dates mentioned in the work orders; that all the material, with the exception of some of the steel for one bridge, was delivered and is either incorporated in the partially completed bridges or stored on the ground; that the structural steel for the one bridge was taken over by the Federal government; that by May 21, 1942, the bridges were partially completed as follows: No. 10.1, 17 percent; 10.4, 30 percent; 10.9, 23 percent, when plaintiffs were forced to cease work due to the participation of the United States in the present World War, the specific cause being that the contractor who had the grading work on the projects moved his equipment and organization to the Sunflower Ordnance plant before completing the berms, which would have enabled plaintiffs to go forward with the bridge construction. Other allegations of the petition were similar to those in *Freeto v. The Commission* and the exhibits attached were the same. Defendant's answer was to the same effect as its answer in the Freeto case. The reply contained a general denial.

C. F. Zeigler testified for plaintiffs that he was graduated from the Kansas State College as a civil engineer in 1918; was employed for a few months by defendant, then went with the Santa Fe Railroad as chief of an engineering party for construction in Oklahoma; that he reëntered the employ of defendant in August, 1925, and continued until October, 1927, when he became the secretary of the Kansas Contractors Association, where he remained until he entered the employ of the plaintiffs in January, 1930; that plaintiffs were a partnership; that one of the plaintiffs died in October, 1923, and his widow is one of the plantiffs here; that he has a general power of attorney on file with defendant which covers his authority to sign bids, bonds, and all other papers necessary for the execution or carrying out of the contract; that his official title is con-

struction engineer; that he prepares estimates, keeps cost data, and has general supervision of all activities, subject to the approval of plaintiffs; that plaintiffs do any general contracting business with the Commission—grading, paving, stabilization, viaducts, subways, and all types of bridges, and had constructed thirty-five bridges for defendant prior to entering the contracts here involved; that at the time bids were received for these contracts bids were also received for the grading on the project, and that was let to Mr. Jones of Emporia; that plaintiffs also bid on the paving, which they did not get because they were not the low bidders; that on being advised that plaintiffs were the low bidders on the bridges they gave orders for various materials and supplies for the major items of material which went into the bridges. The witness described the bridges and the amount of work which had been done on them and testified they stopped work on bridge 10.1 May 20, on bridge 10.4 March 23, and on bridge 10.9 March 21, all in 1942; that this stoppage had no reference to the stop order of December, 1942, which has not been lifted; that they were required to stop until the berms were built by the grading contractor; that bridges had tall piers on account of the main elevation of the highway above the natural ground. This necessitated the construction of approaches and embankments, or approach fills to the elevation of the bridge. It was necessary that the grading be constructed to approximately the elevation of the bridge, as some of the tile had to be driven through the approach to support the end of the bridge structure; that these are the approaches spoken of as the berms. Some effort was made by the witness and by defendant to get Mr. Jones to complete the berms or approaches, but without success. That all of the material ordered for the construction of two of the bridges had been received and had been properly stored and cared for; that a part of the steel for one of the bridges had not been received; that defendant had paid plaintiffs ninety-five percent of the work done and for the materials purchased, some of which had been used in the partially completed bridges and the rest of it stored. Plaintiffs have done a large amount of work for the commission and always found the commission very coöperative, had made no unreasonable demands upon plaintiffs, but on the other hand had done all they could to help along. The witness was thoroughly familiar with the defendant's methods of letting contracts for highway work, was familiar with conditions at the time the contracts

were entered into, but thought they could complete these contracts, and would have been able to complete them if the grading contractor would have completed the berms. The witness thought he could have done so, but did not like to criticize another contractor with respect to what part of his work he did first. The witness tried to take everything into account when the contracts were entered, but did not anticipate that war was imminent, and made no effort to have a provision in the contract pertaining to difficulties which would arise in the event of war. Plaintiffs took other contracts with defendants which they were able to complete in 1942, and took some more contracts in 1942. He further testified that if the grading and berms were completed plaintiffs would be unable to proceed with the contract because they had lost their organization of bridge men which they had built up over a period of years. Some of the men are in the army or in war work or elsewhere and are not available, and because of the death of one of the partners the partnership business will have to be closed. On April 8, 1943, plaintiff requested cancellation of the contracts.

In *Tucker and McCoy v. The Commission* plaintiff sought to cancel a contract executed June 30, 1941, by C. A. Tucker with the commission for 2.888 miles of cement paving in Kingman county. Tucker assigned this contract to C. J. McCoy on March 23, 1942. The assignment was accepted by defendant, but Tucker was held secondarily liable on the contract. It was alleged that Tucker was unable to commence work because he was inducted into the army; that no work order had been issued on the project, and that McCoy was unable to go forward with the work because of the participation of the United States in the present World War for the specific reason that the steel ordered for the contract was taken over by the Federal government for war projects and the orders were cancelled by the steel manufacturers; that on December 24, 1942, a stop order was placed on the project which was not lifted until April 26, 1943, and that before the work started it was necessary for the highway to be graded and bridges to be constructed, which had not been done. Other allegations of the petition were substantially the same as those in *Freeto v. The Commission* and the exhibits were the same with the addition of an exhibit of an order issued April 26, 1943, giving permission to complete the Kingman county contract notwithstanding the revocation order of December 24, 1942. The answer was substantially the same as in *Freeto v. The Commission*

and contained an admission that Tucker is now in the military service and that he assigned the contract to McCoy as alleged in the petition. It further admitted that no work order had been issued on the project, and alleged that plaintiffs had never shown any inclination to perform the work contemplated by the contract or expressed their willingness to commence work, and in fact have had their equipment and organization occupied at all times on other public highway work or national defense projects. The reply contained a general denial.

C. J. McCoy testified that he took an assignment of the contract for the paving in Kingman county from C. A. Tucker and assumed the orders for material which Tucker had given. The project required road mesh, which is reinforcing for pavement, some rods, sand, cement, crushed rock or gravel, and expansion joints. Nothing has been done on the Kingman county project. The job is not in shape for paving. The contract calls for paving after the road has been graded and the bridges built. The bridges have not been built and the grading has not been completed. A work order has not been issued. On May 26, 1942, he received a letter from the Sheffield Steel Corporation which in part reads:

"The contracts we have with you to supply mesh on the jobs in Kingman . . . show that these jobs carry an A-7 priority rating. At the time the jobs were let we were in position to furnish the paving mesh required for this work but at the present time we have several weeks' of high priority mesh on our books for direct defense jobs and definite obligations on other defense projects which indicate very clearly that the shipment date on any of the A-7 tonnage will be indefinite. . . . If you are able to get the State Highway Department to improve these ratings to A-I-e or better we can give you fairly prompt service."

The rating referred to was never obtained. On July 31, 1943, he received a telegram from the same company which reads:

"WPB regulations require that we cancel your order July 1st covering mesh for Kingman county project 54-48 but will gladly furnish material upon receipt allotment number and proper certification."

Since receiving this telegram he has received no indication that the type of steel can now be obtained. He stated the same reasons for not being able to complete the project at the time of trial that he gave in the Cook, Tucker and McCoy case. Some of his equipment is at Emporia and some of it is still out on rentals. Some of it is new and some old and not in good repair at the time of trial; he could not replace his equipment. He is not complaining that no work order

was given, because the job is not ready. The orders given for cement and steel were subject to delivery instructions, which were never given. The orders have not been renewed.

In *Reno v. The Commission* plaintiff seeks cancellation of a contract executed by him with defendant March 10, 1942, for the construction of 7.01 miles of stabilization and double asphalt surface treatment on a described project in Dickinson county. It was alleged that the work order was issued July 30, 1942; that when plaintiff was loading his equipment to ship to the project he was notified by the cement companies that cement had been frozen and was available only for defense projects; that plaintiff was forced to cease work on the project due to the participation of the United States in the present World War, and specifically because, (1) plaintiff was unable to obtain cement for the project, and (2) the priority rating on the project expired October 1, 1943. In other respects his petition and Exhibit 1 are in the same form as in the case of *Freeto v. The Commission.* The answer was in the same form as the Freeto case and alleged the work order was issued July 1, as soon as plaintiff had finished certain national defense work which had occupied his equipment prior thereto, and that the work order was canceled due to plaintiff's inability to get cement at the time; that plaintiff promised to start work on the project July 1, 1943, and a work order of that date was issued; that defendant understands plaintiff's equipment was then tied up on an aircraft job at Bruning, Neb., and was later moved to the army airport at Winfield; that defendant has consented that plaintiff and all other contractors similarly situated complete their defense work ahead of the state highway work when so desired by the federal government, and further alleges that all such national defense work done by plaintiff had been voluntary on his part. The reply contained a general denial.

The plaintiff, S. H. Reno of Kansas City, a practical engineer who had been in the construction contracting business about ten years and prior thereto was employed by defendant, testified to the making of the contract as alleged in the petition. The construction is what is known as soil cement stabilization, a relatively new type of construction which has been used for the last six or eight years, in which pulverized earth and cement are mixed, then wetted and packed to form a base, finished with an asphalt top. The materials necessary are cement, asphalt and stone or sand gravel. Plaintiff owned and used a Flynn road builder for mixing cement with the

soil—the only machine of its kind in Kansas. After executing the contract he placed orders for the cement and asphalt to be used. On April 27, 1942, he obtained a contract with the United States Navy for the construction of an auxiliary field at Gardner, which required the use of the Flynn machine. That work was completed July 25, 1942. He advised defendant he was ready to go to work on his contract and a work order was issued July 30, 1942. While loading his equipment to move to the job he was notified that cement could not be furnished at that time; he advised defendant of this fact and was told to return the work order.

On August 5, 1942, he obtained another contract with the Navy, but this did not require the use of the Flynn machine, which was taken to the Strother Field near Winfield to be used by Mr. Freel, who had a contract for work there. Later he had an inquiry from the area engineer at Pampa, Tex., about the machine, but he had promised defendant to start the Dickinson county work, and defendant objected to the machine being taken to Texas. The area engineer at that point informed plaintiff that he would requisition the machine. About that time Captain Taylor, the area engineer at Bruning, Neb., wanted the machine and made some arrangements with defendant for it to be taken there, where it was kept until September, 1943. Although it was not then in use in Nebraska the army engineer declined to release it and continued to pay plaintiff rent thereon. It was again used at Strother Field near Winfield on a job which began in September and continued until the latter part of November, 1943. Thereafter it was again used at Winfield until about the time of the trial, at which time it was idle. The work under plaintiff's contract with defendant is seasonal and must be done in nonfreezing weather, not later than October 1 for the base and October 15 for the asphalt. Usually the work can be started about the first of June. The work order issued and returned in 1942 was reissued July 1, 1943. Plaintiff did not have the Flynn machine at that time. The Flynn machine is not essential for the type of work required, but plaintiff had built his organization around it. Plaintiff's contract with defendant was awarded upon competitive bidding. In making this contract he had no advantage over other contractors because of his having a Flynn machine. From the plans and specifications he knew the type of work to be performed, the amount and kind of labor needed, and also of materials and their cost; he took all those things into consideration and knew defendant

would expect him to complete the contract, and gave bond for its faithful performance. He took various trade journals and noted what was said therein about changing conditions; tried to keep posted thereon, especially during the last two or three years; he had endeavored to obtain all information possible to help him in his business, and to keep track of changing conditions. He observed such things as the Selective Service Act of 1940, and that the induction process started in October, 1940, and that the National Defense Act was passed in 1940; that the OPM was created early in 1941, and that thereafter restrictions were placed on various kinds of material as the defense war program progressed. He knew the contracting business was a hazardous one. He had access to all the information Mr. Ballard had in his office, and from time to time received particular memoranda from defendant, who was doing its best to keep him advised of what might be anticipated. He was not complaining that the work order was issued and withdrawn in 1942 and reissued in 1943. "I am complaining about my inability to do the work." He was not objecting to the defendant's practice to hold up work orders to accommodate the contractors nor insisting that defendant issue a work order immediately after the contract was signed. He knew at the time he took the contract that this country had been plunged into a war December 7, 1941, and that since then labor was becoming scarce. He had had no difficulty with getting labor prior to that time. He had been performing other contracts with defendant throughout 1941 and mentioned some asphalt work with Mr. Hulme in the vicinity of Dodge City, Garden City and Great Bend. He also had work in Jefferson, and perhaps Leavenworth county, and in Cherokee county—in short he had numerous jobs. All of those matters were taken into account at the time he bid for the contract here involved, and knowing all those things he expected to fulfill the contract. In the fall of 1943 he decided not to fulfill this contract because he couldn't get labor. He was asked and answered the following question:

"Q. Now what is your objection to permitting this contract to remain dormant, as it has been, until you can proceed normally with this work? A. None."

When he made the contract he expected to make a profit on it, and if cost of labor and material had decreased since then he would not ask for a cancellation of the contract. He is not asking cancellation on the grounds that cost of labor and material had

advanced. Defendant has done everything possible, with the exception of the work order, to accommodate plaintiff. At the time he made the contract he did not request any provision to be placed therein to protect him in the event he faced conditions which he now says confront him. Defendant had never threatened him with penalties, and he hadn't thought it would likely do so. The orders given for cement soon after the contract was taken provided for delivery any time up to December 31, 1942. When, early in August, he was told that cement was not then available he made no further effort to get cement, although he knew it had been plentiful since June or July, 1943. When the work order of that date was issued both cement and asphalt were plentiful. He did not at that time have his Flynn machine, and his road graders were at work on the Independence air base, having been sent there about the first of June, 1943. The job there was completed August 24, 1943. He has not attempted to do the work provided for in this contract since that date for the reason that he didn't have his organization. When he turned his Flynn machine over to the army authorities he did so voluntarily. It was never commandeered in any way. He had no trouble getting labor the first half of 1942, but it started to become critical in September or October of that year; he was completing other jobs of the same character; no stop order was issued on this job. On account of the seasonal requirements of the work he stated that at the time of the trial in October, 1944, he would not be able to start to work until June or July, 1945. While he had stated that he had no objection to the contract lying dormant he meant by that until labor conditions improved. He did not mean that he wanted it to run indefinitely. He wanted his contract cancelled because it was so indefinite he did not know when he could complete it.

In *Taylor v. The Commission* plaintiff seeks to have cancelled two contracts executed with defendant June 30, 1941, for the construction of concrete pavement on two described tracts of highway in Rice county. It was alleged that plaintiff had not been able to start work on the projects due to the participation of the United States in the present World War, and specifically that the contractor who had the grading on the project was not able to complete the same until May, 1943; that in the meantime priorities for the two projects had expired and plaintiff was unable to obtain necessary materials. In other respects the petition contained

the same allegations as in *Freeto v. The Commission* and the same exhibits, except No. 2, there having been no stop order on these projects. The answer was substantially the same as that in the Freeto case, but alleged that the grading on the work and culverts was completed upon one of the projects April 22 and upon the other on April 27, 1943, at which time plaintiff's equipment and organizations were engaged in national defense work at the Salina air base and earning a much larger rate of pay than provided in the contracts here involved, and that he has since refused to complete contracts here involved unless granted increased unit prices for the work; and further alleged that he could have secured the necessary labor and materials to complete the contracts after the grading was completed in April, 1943, had he made diligent effort to do so; that no work order had been issued because plaintiff has at all times been engaged elsewhere and has refused to carry out the contracts unless the schedule of prices therein was revised upward. The reply contained a general denial.

The plaintiff, Harry J. Taylor of Salina, testified he had been in the contracting business since 1913 and in highway construction since 1919. He testified to the execution of the contracts as alleged and that Lloyd Jones of Emporia had the contract for the grading on the projects, but after receiving the contracts he had done practically nothing because the grading was not making progress; that he placed orders for materials without giving a shipping date. Necessary materials included reinforcing mesh, expansion joints, center joints and cement and aggregate. It was not practical to have the material come in until he was ready to use it, for there was no place to store it. When the contract was made he had complete paving equipment ready for use. He had engaged in war work and the first contract for that was made May 25, 1942. Prior to that his equipment was idle because he had no work for it. In 1942 he put his equipment to work on the Smoky Hill airfield at Salina, where it was until late October, 1942, when at the request of Captain Long he rented it to contractors who had a job at the Herington airfield, where it was used until late December. Plaintiff took another job at the Salina air base in January, which was completed in May, 1943, when he moved it back to Salina in October. It had not been in use, for while plaintiff had bid on the work he had not been the low bidder; that under date of June 23, 1943, he received a letter from defendant stating in substance the contractors

had been permitted to withhold construction on state highway projects after war was declared in order that their equipment could be used in war projects; that it was now evident that the urgency of this use had passed and that the contractors should complete the construction of the projects insofar as they were able to do so, and requesting plaintiff to make the necessary arrangements to start construction on the projects here involved. On June 24, 1943, plaintiff answered this letter, stating in part that he was willing to do the work on the projects as soon as material could be arranged for by defendant based on compensated increase in price due to the new scale for labor which had been set up by the government for that vicinity and the new prices on materials, and stating that he did not believe it would be a fair request of a state to ask them to complete these jobs now at the old prices, since he was in no way to blame for the delay in beginning construction. Plaintiff received no reply to that letter. At that time the labor market was frozen and it was impossible to get labor for the work and material priorities had been allowed to lapse, which priorities had not been renewed so far as the witness knew. In October, 1943, plaintiff secured work at the Walker airfield, where his equipment was used until Decemeber, when it was taken back to the shop at Salina for repair. He ran into priorities and shortage of repairs; some items he could not get. When the contracts were made plaintiff thought he would get started late in the fall of 1941 and be able to complete the work before 1942. He would not have taken the job if he had known he would not be able to complete the work for two or three years. Plaintiff understands that Mr. Jones had completed the grading work on the project in April, 1943, but he had had no official notice of that. He had made no attempt to do the work after the grading was completed. In his letter to defendant of June 24, 1943, he had stated that he was willing to do the work as long as materials could be furnished by defendant based on increased cost of labor, new parts and material; that he could finish the work if he was permitted to have a new scale, and that was his position at the time of the trial. From May to October, 1943, his equipment was idle, but if he had had a work order he could not have started because he could not get men on account of the labor shortage. His objection to permitting the contract to remain suspended until such a time as he could get labor was that it would cost him a lot of money —the increased cost of the work in materials and labor. Cement

and aggregate were available and reinforcement steel if he had the priorities; that on labor at the time of the trial war projects had the first call, but the basic cost of labor had increased fifty percent; that permitting the contract to be suspended would affect his financial status and liabilities on his bond. There was never any stop order on the job. There was testimony about other contracts which the plaintiff completed at various dates in 1942, but some of those were for different types of construction, and plaintiff explained the circumstances under which it was possible to complete them.

In *Bennett v. The Commission* plaintiff seeks cancellation of the contract executed January 19, 1942, for the grading of 6.497 miles of highway in Wabaunsee county. It was alleged the work order was issued February 25, 1942, that the work was commenced in March, materials ordered for culverts, and the project about seventy-five percent completed by September 17, 1942, when plaintiff was forced to cease work on the project due to the participation of the United States in the present World War, specifically that plaintiff was forced to move his equipment to the Herington army air base; that on December 29, 1942, the War Production Board placed a stop order on the project, which on September 17, 1943, was raised to the extent only of allowing certain work to be done to protect work previously completed. In other respects the petition and exhibits were the same as in *Freeto v. The Commission.* Defendant's answer admitted allegations of the petition with reference to when the contract was made; the work started; that plaintiff had moved his equipment to a national defense project in September, 1942; that in February, 1943, the WPB had modified the stop order of December 29, 1942, to permit the completion of a part of the work, which was done by October 29, 1943, and alleged that the bid and contract in question was upon a unit bid per cubic yard, both for the common earth excavation and the rock excavation; that plaintiff had completed practically all of the other excavation, but had done practically nothing on the rock excavation; that when plaintiff quit work in September, 1942, he did so with the knowledge and consent of defendant and at plaintiff's own volition. The reply contained a general denial of new matter in the answer.

J. K. Price, of Kansas City, general superintendent for plaintiff, testified to the making of the contract, that plaintiff had a complete layout of grading equipment for both earth work and rock

work, also had a full crew of men—seven or eight in a supervisory capacity, about thirty-five skilled operators and twenty-five common laborers; that by September, 1942, the culverts had been completed and sixty-five to seventy-five percent of the grading. About that time plaintiff and the witness, who reside in Kansas City, were called to the office of Mr. Poe, the chief operations manager for the United States army engineers in Kansas City, Mo. (the predecessor of Mr. Pine, who testified as a general witness herein), and asked if plaintiff was interested in grading runways at the Herington army base. Plaintiff replied that he was not interested because his equipment and men were then in use. Later Mr. Poe asked if plaintiff could do the work if the Federal government furnished the equipment, and a contract was made on that basis after plaintiff had consulted defendant's chief engineer, who made no objection thereto upon plaintiff's agreement to come back and finish the work. Soon it was discovered that the equipment the government proposed to furnish was not suitable for the work. Mr. Poe asked plaintiff to take some of their equipment from Wabaunsee county and also from a Cowley county job, and mentioned the fact that they could force plaintiff to move this equipment to the government project. The Herington job was finally completed March 2, 1943, but on December 20, 1942, the majority of the equipment was ready to be released. In December, 1942, the general stop order included the Wabaunsee county project. Plaintiff went back to Cowley county about January 1, 1943. In the meantime the plaintiff had received a contract for a defense project at Grandview Airport at Kansas City and also an access road into the Pratt-Whitney plant at Kansas City. The Cowley county job was completed May 31, 1943. Plaintiff had trouble with the labor situation on that job. By that time the stop orders on the Wabaunsee county job had been in part released and the Cowley county equipment was taken there, where five miles of the original project had been completed by November 4, 1943. The man power situation was critical; plaintiff had about a fifty percent crew. The Rhoades Construction Company had the contract for the bridge across Mill creek and the rest of the plaintiff's contract could not be completed because there was a heavy rock excavation on one side of the creek and a small fill on the other, and it was plaintiff's plan to take the material from the excavation to the fill. When the contract was made in 1941 plaintiff expected to complete it in 1942, and would not have taken the job

if he had known it would be delayed for one, two, three or four years. Plaintiff had rather a large outfit, capable of handling five or six jobs at once, and sometimes had idle equipment stored in Kansas City. The contracts here involved called for payment of $287,274.94. The part completed amounted to $226,947.20, leaving an uncompleted portion of $60,327.74. On the part completed plaintiff had been paid 95 percent. Plaintiff had no difficulty with materials on this job. The Grandview, Mo., job was completed in November, 1943, and the equipment used there was idle until April, 1944. Plaintiff was familiar with the manner of letting contracts by defendant and the contents of the contracts; tried to keep abreast of the times in the contracting business and realized in December, 1941, that one had to be on his toes; he had watched the progress of the national defense situation, including the international phases which were developing in which this country was interested, and knew that certain materials were becoming scarce; that we had begun to have, and did have when the contract was signed, some stringent government regulations; expected some trouble in completing the work, but not in the way of materials; knew that he could reasonably well expect a labor shortage; took all those things into consideration. When it was made plaintiff expected to fulfill the contract; decided not to fulfill it when they had completed it as far as they could go. Plaintiff's objections to letting the contract remain dormant and completing it when conditions get so he can are that it is an obligation hanging over his head as to when and how the job can be completed, as that is indefinite and uncertain; that while his obligation has not changed, intermediate conditions have changed; had conditions changed more favorably to plaintiff he would still have expected the unit price for the work; would not have voluntarily reduced his price, and would not have felt under any obligation to do so; if material and labor prices had fallen he would not have given any of the money back to defendant. Plaintiff's failure to go ahead and finish the contract is not due to any action on the part of defendant; in fact, defendant has been coöperative all the way through; defendant told plaintiff to go ahead on the defense jobs and come back and finish these jobs when he could. In April, 1944, plaintiff moved his equipment to Hutchinson on a municipal airport job and took a contract for the Union Pacific Railroad for heavy riprap. After the Hutch-

inson job was completed he moved the equipment used there to Maryville, Mo., for a job on an airport.

In *Hansen v. The Commission* plaintiff seeks the cancellation of a contract executed April 27, 1941, for the construction of a bridge in Pottawatomie county. It was alleged the work order was issued January 19, 1942, and that plaintiff moved all the material and equipment to the location except the structural steel and cement; that on April 11, 1942, he was forced to cease work owing to the participation of the United States in the present World War, specifically that the steel ordered for the project was taken over by the Federal government and has not been made available; that in December, 1942, a stop order was placed upon the project. Other allegations of the petition and the exhibits were the same as those in *Freeto v. The Commission.* The answer was substantially the same as in the Freeto case, admitted the work order was issued as alleged, stated that the only work done by plaintiff was to drive certain test piling, and that no working days under the contract had been counted against him. The reply contained a general denial.

J. W. Ballard testified he was familiar with the contract and had signed the same under a power of attorney for plaintiff; that the work order of January 19, 1942, had been delayed waiting for the contractor to do the channel excavation; that the structural steel was ordered but could not be furnished due to priorities. A stop order was put upon the work in December, 1942, and so far as the witness knew had not been lifted. He further testified that he had represented plaintiff with a power of attorney for quite awhile and had acted for him, more or less, with the power of attorney and as secretary of the association; that plaintiff was a member of the Kansas State Contractors Association and received the publication sent out by the national association, which is a monthly magazine, "The Constructor," which goes to all members, among them the plaintiffs in this litigation.

In *Cook and Tucker and McCoy v. The Commission* the petition alleged that Cook and Tucker were partners, with their place of business at Ottawa, and that McCoy resided at Emporia; that on October 7, 1941, Cook and Tucker executed a contract with defendant for the grading and concrete pavement of 1.116 miles of highway in Allen county, and on the same date executed a contract for grading and concrete pavement of 2.941 miles of highway in

Woodson county; that the contracts were tied together; that the work order was issued October 20, 1941; that Cook and Tucker constructed the culverts, which were completed July 2, 1942, when they were forced to cease operations due to the participation of the United States in the present World War; that prior thereto C. J. McCoy subcontracted the work remaining to be performed under the contract, which subcontract was approved by defendant, the approval specifically stating that the original contractors were not to be relieved of their liabilities or obligations; that the causes arising from war conditions, which made the contingent performance of the contracts impossible, are: (1) Steel ordered had been taken over by the federal government and plaintiffs' orders were cancelled by the manufacturers, and steel had not been made available; (2) priorities granted for the projects expired and the parties were unable to get new or extended priorities. Otherwise the petition was substantially the same as that in *Freeto v. The Commission,* hereinbefore set out, including grounds for the cancellation of the contract, and exhibits attached to the petition were the same except Exhibit 2, the stop order of December 24, 1942, and it was alleged that there was no stop order on these projects. Defendant's answer was substantially the same as in the Freeto case, but alleged that C. J. McCoy, subcontractor from Cook and Tucker, subcontracted only a part of their contract, which provided for the construction of the concrete slabs, and further alleged the federal government never issued any stop order or any other limitation order affecting the work under the contract; that plaintiffs voluntarily quit work thereon July 3, 1942, and that although their equipment has not at all times been used on national defense work, and has been available for use on the contracts, plaintiffs have shown no inclination to proceed therewith. The reply included a general denial.

A. L. Ames testified that he had been the construction superintendent for A. L. Cook & Co. for many years, and after the death of Mr. Cook, and Mr. Tucker went to the army in May, 1942, he took over the handling of the work under a general power of attorney filed with defendant; that on October 7, 1941, three contracts for grading, culverts and paving were executed by Cook & Tucker; that one of these contracts was canceled; that the work order was issued October 20, 1941, on the other two contracts; that plaintiff began building the culverts on the Woodson county con-

tract on November 10 and they were completed by December 30, 1941; that on the Allen county contract some work was started on the culverts and grading about November 10, 1941, but no important work was done until June 2, 1942, and that the culverts on that contract were completed July 2, 1942; that these delays were because of weather conditions; that about December 9, 1942, the witness had a conversation with defendant's engineer and had oral permission to move the equipment to Nemaha county, where some work on Highway No. 36 was badly needed; that all of the grading equipment was moved from Allen and Woodson counties to Nemaha county, where the work there was completed and accepted November 19, 1943, but in fact practically all of the work in Nemaha county had been done in 1942; that in November, 1942, the witness was advised through the Contractors Association that the government wished him to put his equipment on defense work, or essential work; that the equipment was moved to the Boeing air plant at Wichita in February and April of 1943. The equipment was used on access roads at Wichita and on the Streuther Field at Arkansas City and at Winfield. That work was finished in 1943 and since then the equipment has been used on odd jobs. At the time of the trial the grading had never been done on the Allen and Woodson county contracts and the grading would have to be done before the concrete pavement could be laid. Quite a little of the testimony of this witness was taken up with matters not especially pertaining to the contract sought to be canceled in this action. Testimony and exhibits were offered with respect to the one contract which was canceled, but since plaintiffs are not attempting to recover anything here because of that cancellation, nor does the evidence tend to show they would be entitled to recover anything, we see no necessity of detailing it. Also the witness testified that Mr. A. L. Cook had contracts with defendant in his own name, and also contracts which he and some other person had taken as partners. The evidence tended to show that most of those contracts had been completed. The witness testified that in November, 1942, he and some other persons interested in some of those contracts met with defendant's officers, at their request, to discuss the completion of the work under contracts in which Mr. Cook was interested, at which time the witness advised defendant's officials that although it had been very difficult to obtain steel, labor and equipment, they had gone ahead and were figuring on completing

those contracts even though they ran into costs which had not been anticipated at the time the bids were made. The witness testified: "We did the best we could with what we had at that time, and what we could get."

C. J. McCoy testified that he had been in the contracting business thirty-two years; that he took a subcontract from Cook and Tucker for the paving on the Allen-Woodson county highway; that he took over orders for material that had been given by Tucker, and later made some orders himself; that these orders were subject to shipping instructions which never were given, and that some of the orders, at least, had been canceled and had not been renewed; that the concrete pavement could not be laid until after the grading was done; that the grading has never been finished; that no work order has been given to him on the paving; that ordinarily he would expect to complete the paving work on the Allen-Woodson county project in about two months after getting started, and that he would not have taken this subcontract if he had known at the time that he would be delayed one, two, three or four years in completing it. At the time of the trial he could not complete the contract because he had no organization; all his good men were gone, and the labor was such that he could not get an organization; his equipment was not in good shape, and some of it was still out on the rental basis.

In *Jones v. The Commission* plaintiff's petition is in two causes of action. The first seeks cancellation of two contracts with defendant executed September 11, 1941, for grading on two highway projects in Miami county. It alleged that plaintiff started work on the projects, but on May 4, 1942, was forced to cease work and has been unable to continue due to the participation of the United States in the present World War, specifically, (1) the contractor who was to construct the bridges on the project was unable to secure the necessary steel and could not complete the bridges to enable plaintiff to continue grading, and therefore plaintiff moved his equipment to the Sunflower Ordnance Works at De Soto, where the equipment was required for government construction; (2) because of the stop order of December 24, 1942. The second cause of action sought cancellation of two contracts with defendant, executed March 6, 1942, for the grading of two highway projects in Lyon county. It alleged plaintiff started work on the project, but was unable to continue because of the participation of the United States in the present World War, specifically, (1) that on April 11, 1942,

the War Production Board placed a stop order on the project, which stop order was shortly thereafter lifted and plaintiff again commenced work; but on December 19, 1942, another stop order was issued which required cessation of all work on the project; (2) plaintiff was informed by army officials, through his agent J. W. Ballard, secretary of the Kansas Contractors Association, that unless his equipment was made available for war projects the same would be taken under the authority of USCA, Title 50, § 721, and plaintiff made his equipment available to the federal government; (3) that priorities for highway construction were not sufficient to enable plaintiff to obtain repairs even though the equipment were available; and (4) that labor had been withdrawn from highway construction to work on war projects and is not and cannot be made available. Other allegations of the petition and exhibits were the same as those in *Freeto v. The Commission*, hereinbefore set out. The answer was the same as in the Freeto case except defendant admitted that it had refused to cancel the contract and that plaintiff quit work on the Miami county contract about May 4, 1942, and alleged that plaintiff quit such work voluntarily and with the knowledge and consent of defendant in order that plaintiff might engage in national defense work; and further alleged that the bridges referred to had been contracted by Geiger and Rutherford to be built, and that such bridges could not be completed because of plaintiff's failure to complete the grading; that plaintiff commenced work on one of the Miami county projects on October 27, 1941, and had completed about 27.7 percent of the work before he moved his equipment to national defense work about May 4, 1942, at which time defendant stopped counting working days on the project; that upon the other project in Miami county no work order had been issued because plaintiff's equipment was not available for work, the same being used in other work.

The plaintiff, Lloyd K. Jones, of Emporia, testified to the execution of the contracts as alleged in the petition; that work was commenced on one of the Miami county contracts and continued until about April 15, 1942. About that time Mr. Rathbun, representing the Lozier-Broderick-Gordon Construction Co., which had the general contract for the Sunflower Ordnance Works at De Soto, came to him and wanted him to take his equipment to work on that job. The two of them had a meeting with defendant's engineers, where the situation was discussed. It was represented that

the work at De Soto would perhaps last thirty days, when plaintiff could go back and finish his contract with defendant. Defendant consented to plaintiff moving his equipment to the De Soto work and it was moved there the latter part of April and early in May. The first contract plaintiff made for the De Soto work was on April 27, 1942. Others were made later. When he got his equipment inside the area of the Sunflower Ordnance Works he was not permitted to remove it. Plaintiff received defendant's general letter to contractors of June 12, 1942, set out in the case of *Rhoades v. The Commission* herein, and counsel stipulated that this letter was sent to all the contractors. Plaintiff was promptly advised by Mr. Hines, construction manager at De Soto, that Mr. Jones' equipment on that project could not be released, due to the emergency nature of the work involved. On August 10, 1942, defendant wrote plaintiff about finishing up the grading in Miami county next to the bridges, which was a part of the general project, stating that the bridge contractor had his material on the ground and was ready to go forward, but had trouble doing so before the grading, particularly the berms and probably fifty or sixty feet of the fill outside of the bridges should be completed. Names were suggested from whom plaintiff might rent some equipment that would enable him to finish that part of the work. Plaintiff replied that he had contacted the parties mentioned, but was unable to rent necessary equipment; that he would very much like to finish the abutments on the Miami county job, but would have to hold up temporarily until equipment could be secured. He stated he had a small shovel and three dump trucks not in use which could finish that work if working days were not counted on the use of the small equipment, but Mr. Rathbun advised plaintiff that even this small equipment could not be released. On October 19, 1942, defendant wrote plaintiff again urging him to get equipment to finish at least the abutments and approaches to the bridges in Miami county. Defendant replied under date of October 29 that Mr. Rathbun did not want any of that type of equipment to be moved, spoke of some special efforts he had made, and stated:

"I wish to coöperate with you in every way possible, and if you can secure permission from the War Department for me to move, I will be more than glad to move back at any time."

Plaintiff's equipment was kept at the De Soto plant until the work there was finished on June 11, 1943, when it was moved on

a project with the War Department for building levees on the Missouri river, where it was kept in use for about five months. Respecting the Lyon county contract, on April 11, 1942, defendant's resident engineer informed plaintiff to cease construction on the project pending a decision of the War Production Board. Two days later plaintiff was advised to proceed with the work, which he did for a time until the equipment in use there was removed to the Sunflower Ordnance Works, where it followed the use of the other equipment. On December 24, 1942, the War Production Board placed a stop order on the project, which had not been lifted. When he went into defense work about the middle of April, 1942, he found defendant's engineers willing to coöperate in every way they could. Plaintiff is still tied up on defense work. The equipment is getting old and more worn. He has a lot more work than has been referred to, and on account of uncertainties would like to have the contracts relinquished.

In *Stannard Construction Co. v. The Commission*, plaintiff seeks cancellation of two contracts executed October 15, 1941, for the cement pavement on two described projects in Cloud county. It was alleged that a work order had not been issued and plaintiffs were unable to commence or complete the work due to the participation of the United States in the present World War, specifically that the contractor who had the grading work had not completed it and that priorities for material expired June 30, 1943, and there were no priorities for repairs or equipment. Other allegations of the petition are substantially like those in *Freeto v. The Commission*, and the exhibits are the same, except Exhibit 2 was omitted, there being no stop order on the project. The answer is substantially like that in the Freeto case and alleged that materials for the construction had been available, but due to the fact that List and Clark had not completed the grading no work order had been issued for the paving contracts; and further alleged that plaintiffs at all times had their equipment and organization occupied on other public highway work or national defense projects, and that some of the highway work had been completed, and other was in progress. The reply contained a general denial.

G. A. Stannard of Wichita, testified that plaintiff is a partnership; that the contracts were executed as alleged; that List and Clark had the contract for the grading, which had never been completed, and for that reason no work order had been given; that plaintiff had

adequate equipment and a full crew of men; that the material required was cement, aggregate and steel, reinforcing bars and mesh; that plaintiff had other contracts for highway construction with defendant, which he was able to complete and did work on defense projects, which were described; that on September 21, 1942, he had its attorney write defendant asking to have the contract canceled in view of the delay in getting to the work. Defendant answered that while the projects could not be constructed at that time it considered it would be only a matter of time until the grading work was completed so that the work under the contract could progress; that it realized that as long as the war projects were active it would be necessary for contractors to construct the war projects first, but that it would expect the work on the projects in question to be completed as soon as the situation would permit. Plaintiff further testified that under ordinary conditions the Cloud county projects would take about 60 days; that plaintiff would not have undertaken the contract if he had anticipated it would take two or three or four years; that even though the grading work was completed plaintiff would not be able to complete paving projects at the time of the trial because he could not get enough labor together to do it; that he was able to get labor up to May, 1942. Plaintiff had been in the contracting business since 1919, and since 1928 with defendant; was familiar with and understood the plans, specifications and terms of the contract, took the contract under competitive bidding, took into consideration the type of work, labor and materials necessary for the job, and after doing so executed the contract and gave a surety bond to guarantee its faithful performance. Plaintiff had kept abreast of the times, took some trade journals and engineering magazines, watched closely the various governmental regulations that affected contracting work, was aware of the selective service act, National defence act and OPM, when it was established, and the various agencies, and had access to the office information and experience of Mr. Ballard's office for the use of contractors. When the contracts were made the witness was aware of and appreciated the uncertainties of the times and that some armed forces had left the United States. He experienced no labor shortages until June, 1942. He knew the work could not be done until the grading and culverts were completed. Plaintiff was not objecting that no work order was issued, for it wouldn't have done any good. His objection to letting the contract remain dormant

is that circumstances have changed since it was executed. At the time the contract was made he did not have to have a provision inserted therein which would protect him against the contingencies which arose. None of the materials for the job have ever been ordered shipped. If the price of labor and materials had declined since the contract was executed he would not seek a cancellation of it. His equipment has been on war work since June, 1942. No stop order was issued on the Cloud county work and there was an allotment for material for the fourth quarter of 1943.

In *Hulme v. The Commission* the plaintiff seeks the cancellation of three contracts executed August 28, 1941, for the stabilization and double asphaltic surfacing of three described projects in Barton and Rush counties. The petition alleged plaintiff commenced work in September, 1941, had worked but one day when he stopped because it was too late in the season for this type of construction; that in the spring of 1942 work on the project was performed intermittently when the weather permitted, but before the projects could be completed plaintiff was forced to cease work due to the participation of the United States in the present World War. Specifically it was impossible to get asphalt, as all defense jobs were given priority over other work. The petition contained substantially the same allegations as those in *Freeto v. The Commission,* and the exhibits were the same, except Exhibit 2 was omitted, there being no stop order on the projects. The answer was substantially the same as in the Freeto case, and it was alleged that work orders were issued on all three contracts September 3, 1941; that in the spring of 1942 plaintiff started the work and completed about 30 percent thereof on each project; that about June 6, 1942, he removed his equipment and organization off the work for the ostensible purpose of working on national defense work, leaving a large windrow of material, necessitating a long detour; that he returned to the job late in July and put the road in temporary condition for traffic, and again left for the ostensible purpose of doing defense work; that in fact plaintiff secured no federal contract prior to August, 1942, and his equipment was idle during that time; that plaintiff did in fact complete other work of the same or a similar kind in 1943, and that labor, equipment, repairs and material were available and priority rates were sufficient to enable him to complete the work. The reply contained a general denial.

The plaintiff, Charles Hulme, of Great Bend, testified to the

execution of the contracts here alleged; that they were signed by J. W. Ballard under a power of attorney; that they called for a stabilized base with a double asphalt surface treatment; that the base consisted of certain grades and proportions of sand and dirt filler, wetted and rolled down to a smooth surface, and this to be covered with a double asphaltic treatment; that the machinery required was road patrol, rollers, sand trucks, sand equipment to produce and load the sand, and that he had on the project a Barber-Green machine for the mixing of the material and spreading it on the roadway in windrows to be leveled out by the patrols after part of the water had evaporated from it; that it was seasonal work and that the specifications required:

"Construction work on the project shall be so arranged that all materials for the base, delivered to the project, shall be mixed, spread, compacted and finished, ready for the bituminous surface by October 1. No bituminous material shall be placed on the surface of the base after October 1, except that sufficient material, as determined by the engineer, may be placed to satisfactorily protect the completed surface until such time that work can proceed the next season, and in no case shall any bituminous material be placed after October 15."

He further testified that the work order was issued September 3, 1941, and the work started September 13; that he was stopped by the state on account of the lateness of the season for the simple reason that he could not complete any one of the projects that fall. Soon thereafter he made a supplemental agreement with defendant to put on a road surface of crushed rock so the road could be used for traffic and kept in better shape for the next spring; that during the winter he got out about 2,000 tons of sand piled in a convenient place for use (the contract required more than 50,000 tons); that about March 12, 1942, he commenced work and continued until June 6, 1942, but the weather was such that he got in only forty working days; that about June 1 Mr. J. W. Ballard told him of a contract to be let at Tulsa, Okla., for an air base at Pratt. He went to Tulsa and bid on that work and had a letter dated June 17, 1942, which embodied a tentative contract, subject to further approval. The first work to be done at Pratt was testing the subsurface by drilling and the use of a sand bucket. He took two or three men to Pratt and started that work, when he was advised on July 17 that it was a British project and had been disapproved by the government of Great Britain. He later presented a claim to the United States for the work done and was allowed and paid therefor $131.81. He at-

tempted to get other defense work contracts and finally got a sub-contract at Alva, Okla., which began about August 10, or a few days prior thereto. He did no construction work on the contracts involved after June 6, 1942, except that late in July of that year plaintiff advised defendant that he was going to work on a defense job, defendant having learned that ridges of sand had been placed on the projects here involved which interfered with travel. Defendant requested plaintiff to move that gravel over to the side of the road, which plaintiff did. After finishing his work at Alva in November, 1942, plaintiff got subcontracts for defense work on various projects which carried him along until late in 1943. In the meantime plaintiff had completed some other contracts with defendant, and defendant urged him to complete the contracts here involved or furnish proper information as to his work on other defense jobs. There was some delay by plaintiff in doing this and the defendant wrote his bonding company urging that the work progress. In the meantime most of plaintiff's equipment had been scattered around and rented to be used in various places and it was difficult for him to get men. Defendant assisted plaintiff in getting priorities for the purchase of some new machinery, none of which was used on these projects. On some date in 1943 plaintiff bid on another contract with defendant. On April 9, 1943, plaintiff wrote defendant asking when he could start on the contracts here involved. This was referred to the divisional engineer, who, under date of April 22, 1943, advised plaintiff "that you can proceed on the above projects immediately," the projects being the ones here involved. No work was done on the projects in 1943. On May 10, 1943, defendant wrote him that before issuing a work order on the new contract it desired a statement from him that he would go ahead and finish the projects here involved as soon as he finished his new contract, and that defendant desired the work on all these contracts should be completed that year. Plaintiff replied that he still had some work on the Great Bend air base and stated: "I also expect to complete all projects just as soon as I can complete the air-base work." The witness further stated that on account of labor conditions it would not be possible for him to proceed with the work at the time of the trial, and that he would not have executed the contract if he had known it was going to take two or three or four years to perform it. He further testified that he had been in the contracting business for over thirty years; that he tried to keep abreast of the times as pertains to his business; that when he

took the contracts here involved he knew the kind of work it was, the material and labor needed and the time within which he could be expected to complete the work, and the price defendant was required to pay, as fixed in his bid; that he took all these things into consideration at the time he made his bid and furnished bond. No stop order had ever been placed on the work.

In *Rhoades et al v. The Commission* the petition alleged petitioners are partners and have their principal place of business at Newton, and set out two causes of action. The first sought cancellation of a contract executed February 17, 1942, for the construction of a bridge over Mill creek, and a contract executed March 23, 1942, for the construction of a viaduct over the Rock Island railroad, both on Highway No. 10 in Wabaunsee county. Though executed on different dates the contracts were tied together. Work was not started on either of the projects. One of the grounds alleged for cancellation was that no work order had been issued by defendant. The second cause of action sought cancellation of a contract executed June 30, 1941, for the construction of a bridge over the Ninnescah river on Highway No. 54 in Kingman county. It was alleged the work order was issued September 24, 1941; that plaintiff began work December 1, 1941, discontinued work on December 7, 1941, and has been unable to continue due to the participation of the United States in the present World War. Other allegations of the petition are similar and the grounds alleged for cancellation are the same as those alleged in the case of *Freeto v. The Commission,* hereinbefore set out. The answer contained allegations to the same effect as the answer in the Freeto case, but admitted no work order had been issued on either of the Wabaunsee county bridge contracts; that the work order was issued for the Kingman county bridge on September 24, 1941, and alleged that the only work done on the Kingman county bridge was the driving of a few test piling and the delivery and painting of steel piling, and that no work days had been counted against the contractor.

The plaintiff, J. H. Rhoades, testified that the materials necessary for the construction of the Kingman county bridge are construction steel, reinforcement steel, cement, sand and gravel; that on June 11, 1941, the day bids were received for the Kingman county bridge, he placed an order with Christopher & Son Iron Works at Wichita for the steel needed, and waited for its delivery;

that about August 1, 1941, the Christopher Iron Works sent witness copy of a letter it had received from the Carnegie-Illinois Steel Corporation stating the order had been withdrawn from their production schedule because no production rating had been assigned to the project; that on September 5, 1941, the witness wrote defendants that in the Contractors Association Bulletin of September 4 there were items regarding priorities on highways under various classes, and that the Federal Aid System of Highways is third under the list of six classes, and asked what steps should be taken to obtain material for the Kingman county bridge.

On September 10, 1941, defendant replied, stating:

"The Office of Production Management has established a procedure through the Public Roads Administration and the State Highway departments where priority assistance may be obtained. The State Highway Commission will be required to submit a list of projects for which they request preference rating order numbers. The above numbered project will be included on the first list submitted.

"It will be necessary for the contractor to submit to this office two copies of his purchase order to his material supplier, . . ."

and outlining further how the matter would be handled. Plaintiff replied to this letter on September 17, enclosing a copy of the material order covering iron and steel items required for the Kingman county bridge, and further stated:

"For your information, we have already received the steel piling, both permanent piling and test piling and part of the reinforcing steel; however, we have not received all of the reinforcing steel required for the work. We are now being delayed on reinforcing steel for the superstructure. . . ."

and stating that whatever defendant could do to help release the superstructure material would be appreciated.

Defendant replied on September 24, returning the copies of the order submitted September 17, and stated:

"As we understand it, it will be necessary for the contractor to submit copies of purchase orders as outlined in my general letter of September 19. [Not offered in evidence.] On this purchase order you will be required to list the quantities, value and specific delivery date. The form will also have to be signed by the contractor. . . ."

and outlining the further proper procedure.

October 2, 1941, plaintiff wrote defendant:

"We received a work order on the above referred bridge, effective September 24. Due to inability to secure test piling until Priority numbers are obtained for our suppliers by the State Highway Commission, I believe it ad-

visable that we file a request for change in plans for this, asking for a 90 day extension in the number of working days.

"At the present time it is unknown as to when the State will secure the Priority ratings from the OPM, and until such rating is secured and a reasonable additional time allowed for securing the material, there is nothing we can do on this project."

Replying thereto on October 4 defendant wrote:

"Upon receipt of your order to the Carnegie Steel Company that they are unable to furnish the steel because of defense operations, you may accept this letter as authority for 'Temporary Suspension of Work' until such a time as this steel is delivered to the project."

There was further correspondence. October 8 defendant wrote plaintiff for further information and plaintiff replied October 11, but apparently not furnishing all the information which previously had been requested. October 21 plaintiff sent defendant copy of a letter of October 18 from the Carnegie-Illinois Steel Corporation which referred to the "bearing pile on the job in Kingman county," and stated they "have tentatively placed this material in their schedule to be rolled some time in February. However, it will be necessary that the lengths of the piling be given about the first of the year. This schedule depends upon we receiving a priority number," and inquired when the priority number might be assigned to this project. About November 4, 1941, plaintiff received from defendant the following:

"MEMORANDUM TO ALL CONTRACTORS

"Gentlemen:

"We have just received Preference Rating Order numbers from the Director of Priorities for all the projects that were in our first application submitted September 12, 1941. This application included all Federal Aid projects of all types (with a few exceptions) on which bids were received prior to September 15, 1941, and are in addition to the projects on which the interested contractors have been previously notified.

"We will immediately send out purchase orders involving these projects that are now in our office and have been held by us awaiting the preference rating orders.

"Any additional purchase orders that you may wish to send in to this office will be handled as quickly as possible.

"Please refer to our general letter, dated September 19, 1941, for information relative to the submission of these purchase orders."

Plaintiff offered in evidence a letter dated January 21, 1942, written by Christopher and Son to defendant, answering its letter for information respecting materials on jobs in Kingman county. With respect to the bridge contract in suit the letter stated:

"We have delivered one carload of these beams and the balance is being fabricated, and should be ready for shipment about the first week in February. The steel for the diaphragms is being fabricated and should be ready for shipment about the same time,"

and further stated that as soon as the writer could get that information it would be furnished. Also a letter from Christopher and Son to plaintiff, of February 24, 1942, stated with whom orders had been placed for part of the material for the bridge and suggested that the Highway Department proceed with redesigning the job so that material obtainable might be used. Also a letter from Christopher and Son to plaintiff, dated March 5, 1942, referred to the job in Kingman county, stated the writer had again contacted Carnegie-Illinois, who had contacted the Bethlehem Steel Company and said:

"It is going to be almost impossible to get any kind of delivery. In fact the steel situation from the mill's point of view is becoming more and more acute as they are being continually loaded up on higher priority materials."

There was further discussion about the redesigning of the bridge and the importance of checking up on the material to see if it could be obtained. Plaintiff answered this letter by one of March 6 asking Christopher and Son to go ahead and figure the price of the steel and rails and other materials that might be used on a redesigning of the bridge. On March 25, 1942, plaintiff wrote defendant advising that he had checked with Christopher & Son and found that they had certain material on hand and defendant would be advised on the redesigning of the bridge. On May 4, 1942, defendant wrote plaintiff, sending a copy of the redesigned plans upon the bridge and stating:

"We would like for you to study these plans and arrive at new unit prices which would be satisfactory to you to construct the structure as redesigned. We would also like for you to make up a list of all material which you have on hand and which can not be used in the revised design. I would then like for you to meet with us at 10 o'clock next Monday in this office for a discussion relative to drawing up Change Orders and Supplemental Agreements changing the design of the bridge."

The evidence does not disclose any report by plaintiff concerning the redesigned plan for the bridge. Plaintiff also introduced in evidence a mimeographed letter, dated June 12, 1942, sent to all contractors by defendant, which reads as follows:

"A number of the contractors who have incompleted contracts with the State Highway Commission have obligated themselves to construct war projects or portions of war projects which requires the use of their equipment.

This will render the State Highway project inactive for a period of time until such equipment can be released from the war project; consequently, a definite understanding should be had between the contractor and the State Highway Commission relative to the responsibilities on the project.

"In order that the State Highway Commission might have sufficient proof that it is necessary to suspend work on the State Highway project so that necessary equipment might be available for use on war projects, it will be necessary that the contractor advise the District Engineer of the War Department in whose district the contractor is located that he has a contract with the State Highway Commission for the construction of certain State Highway projects and he is desirous of having the District Engineer advise the State Highway Commission, through the State Highway Engineer, that he (the contractor) has contracted for the construction of certain war projects which will necessitate the use of his machinery for such work.

"After such a letter has been received by this office, the contractor will be notified, so that a meeting can be held in this office for the purpose of fixing definite responsibilities for the future handling of the State Highway project or projects. . . ."

A copy of this was sent to the U. S. Engineers office at Kansas City, Mo., Albuquerque, N. Mex., Tulsa, Okla., and Denver, Colo., together with a mimeographed letter which reads as follows:

"In view of the fact that a large number of war projects in the State of Kansas and adjoining states are under construction, and a number of the contractors in the State of Kansas who hold State Highway contracts at this time have entered into a contract with the War or Navy Departments for the construction of certain war projects, it is imperative that the State Highway Commission of Kansas have authoritative information from the District Engineer advising that such contractor has a contract with the War or Navy Department and that his equipment is necessary for the prosecution of such work.

"The State Highway Commission of Kansas has a large number of State Highway contracts under construction and desires to have these contracts completed as soon as possible, but wishes to coöperate with the War and Navy Departments to the fullest extent and is agreeable to the releasing of the contractor's equipment from said State Highway projects, if absolutely necessary, for such a period of time as it is needed to complete these war projects. However, it is necessary that we have a letter from your office, advising us of your contracts with said contractors and the urgent need of contractors' equipment, so that the Public Roads Administration can be given definite information and the State Highway contracts which are held by these contractors may be adjusted accordingly.

"I am enclosing herewith copy of a letter which has been sent to each of the contractors who are holding contracts for the State Highway work, which is for your information.

"I am glad to coöperate with you in this war effort and trust that I am not asking of you something which you are unable to do."

Plaintiff testified that he did not remember receiving this communication of June 12, 1942, and that he did not go to defendant's office to talk the matter over.

Plaintiff also introduced in evidence defendant's letter to plaintiff of September 1, 1942, the pertinent portions of which read:

"The War Production Board has allocated a certain tonnage of steel to carry ratings of AA-2X, AA-3 and AA-4 for highway work for third quarter deliveries ending September 30 and fourth quarter deliveries ending December 31, 1942. This quantity of steel is to be allocated to the various highway projects through the Public Roads Administration. We have been requested to submit a list of our projects showing the steel necessary to complete them.

"For your information I advise that we listed 344.55 tons reinforcing and structural steel for third quarter delivery for project 54-48 FA 341 H (4) . . . [and other amounts for other contracts between the parties.]

"We have already received an AA-2X rating for two projects within the State and it is very probable that we will receive ratings for the projects numbered above.

"This information is given you so that you may be prepared to proceed with the construction of the projects in case these ratings are received. We will, of course, notify you as soon as we receive further information relative to the projects."

Plaintiff introduced in evidence defendant's general letter of October 29, 1942, which reads as follows:

"Since we wrote you on June 12, 1942, asking you to come to this office for a conference if you were then or later obligated on a War Project and also obligated to the State Highway Commission, several contractors obligated to the state have visited our office and satisfactory arrangements have been entered into. In fact, since that date, even under present difficulties, remarkable progress has been made toward completing a number of the state and state-Federal projects, and the fine coöperation on the part of those contractors working on such projects is sincerely appreciated.

"Enough time has elapsed since that letter that we can see more clearly our contractual problems, i.e., labor, equipment, materials and the apparent scope of Federal war activities. Frankly, for several months these problems have received a lot of attention on the part of Mr. D. J. Fair, Director, and those of us charged with the engineering duties for the Commission. Now, it is our candid belief that in the near future we are to experience some definite relief and that many Kansas and Kansas-Federal road projects may be resumed and carried to completion.

"If for any definite reason you cannot accept our present attitude as sound, and you are surrounded with difficulties beyond the scope of your .contract, I would appreciate it if you would immediately call on us that we may be acquainted with those facts. I assure you we desire to work whole-heartedly with you, giving full consideration to all available facts, and arrive at a definite conclusion that will be fair to both parties.

"These are strenuous times and call for coöperative effort.

"This communication, like the letter in June, is going to all contractors, this date, with whom the Highway Commission has contracts, and we will be glad to arrange for an early conference with every one who has not been in to date or anyone who desires to go over his plans and problems with us."

November 1, 1942, plaintiff wrote defendant as follows:

"Your general letters of October 29, received.

"I do not recall of ever receiving your letter of June 12, 1942, nor can I find any record of same in our files. This is explaining our reason for not visiting your office and making satisfactory arrangements on Contracts for which we are now obligated to the State Highway Commission.

"At the present time we have all our equipment and personnel tied up on War Contracts at Herington, Kansas and Dodge City, Kansas and expect this will remain the same for the balance of the year and part of 1943.

"I plan to be in Topeka, some time during the next two weeks and will get in touch with you then in regard to these contracts that we now have outstanding."

On December 29, 1942, defendant wrote plaintiff as follows:

"I am in receipt of a revocation of preference rating on above project from Ernest Kanzler, director general for operations, War Production Board, copy of which is being furnished you. You will note that this revocation prohibits the delivery of materials or further construction on the grade separation on this project at this time.

"This order will be in effect until you are further notified."

With the letter was sent a copy of the order referred to therein and generally spoken of in this case as the "stop order of December 24, 1942," a copy of which has been hereinbefore set out as an exhibit to the petition in the case of *Freeto v. The Commission.* On December 31, 1942, plaintiff wrote defendant as follows:

"Since practically one year has passed and we have been unable to secure any of the major materials required for the construction of the project, we therefore ask that the Commission cancel our contract on this work, and that we be relieved of any further obligation concerning it.

"We have on hand, the bridge No. Plates for this project and ask that the Commission take these at our cost."

In reply thereto defendant on January 6, 1943, wrote plaintiff as follows:

"The stop order as issued by the War Production Board is merely a temporary order and will be rescinded as soon as conditions change to the point where material and labor can be secured for the construction of the project. To my mind this does not change the status of your contract at all but merely gives an official recognition to the fact that material is not available for the structure.

"At the present time it is the policy of the Highway Commission to allow contractors to cease operations on our highway construction and to work on

National Defense projects and to allow them for any time which is necessary to secure the materials. The Commission has, however, refused to cancel any contracts and in all probability would expect the contractors to complete the work when conditions permit. It may be that the Commission will revise their attitude in the future, however, we are working on the above basis at this time."

The witness further testified that the stop order of December, 1942, had not been lifted; that he had not as yet received material necessary to construct the bridge; that if the stop order were lifted he would not be able to complete the construction of the bridge because priorities were not high enough to obtain structural steel; that lumber for concrete floors could not be secured; that he had no organization and could not get the labor, and that his equipment was not in as good condition as when the contracts were made; that from August, 1942, up to the time of the trial his equipment had been in use on war contracts, although recently some of it had been released; that when he executed the contract he expected to complete it in about eight months, and that he would not have entered into the contract if he had known that he could not complete it in three and one-half years.

Respecting the contracts set up in the first cause of action of the petition which plaintiff sought to have canceled, the witness testified that the contracts were first advertised to be let on December 20, 1941; that prior thereto and on Decemeber 17, 1941, defendant addressed a mimeographed statement to all contractors which identified the Wabaunsee county contracts and stated:

"This is to advise that we have now obtained P-19e Preference Rating Orders for the above projects, which are' to be let December 20, at Alma, Kansas.

"All three of these projects carry an A-4 Preference Rating."

. That for some reason the letting on December 20 was canceled and the letting was held at Alma on December 27, 1941; that plaintiff was the low bidder on two of the bridges, for which the contracts were actually executed February 17 and March 23, 1942; that no work was done on those contracts, and that no work order was ever issued; that the stop order of December 24, 1942, prohibited further work on those contracts; that when he made the contract for the Kingman county bridge he knew the defense program had gained momentum since 1940; that there was a priority rating of A-7 on that bridge, and he did not expect difficulty in getting materials; that he knew defendant would not expect him

to work until he had materials; that on July 7, 1941, he executed contracts with defendant for the construction of two bridges in Elk county, one of which was finished February 16, 1942, and the other July 1, 1942; that on May 15, 1941, he executed a contract with defendant for the construction of two bridges in Ellsworth county, which were completed on April 13, 1942; that on May 10, 1941, he executed a contract for the construction of a bridge in Sedgwick county, which was completed September 23, 1942. These bridges were of a different type from the Kingman county bridge; also a few days difference in the ordering of material made it more difficult to get material; that he was informed of the policy of the commission to allow contractors to cease work on highway construction to work on national defense projects and to allow them time to get materials, and they regarded the highway contracts as suspended until it was reasonably possible to complete them, but had declined to cancel the contracts because of the war conditions. He never was advised of any different attitude. He further testified that it was difficult to get labor in 1942 and became more critical later, and that there was some difficulty in getting cement in 1942; that because of previous orders made by plaintiff for material which had been delivered plaintiff was able to complete the contracts of other bridges, and perhaps would have been able to complete this one had it been able to get structural steel.

We now take up the legal questions argued. The parties will be referred to as they appeared in the trial court. Plaintiffs state the legal question for our determination as follows:

"The only question involved is whether or not plaintiffs' evidence as against a demurrer was sufficient to show that the contracts were invalid, because of impossibility of performance due to war conditions, and thus justify a court of equity in cancelling the contracts and giving the plaintiffs judgment for reasonable compensation for work performed and materials supplied."

As to the first phase of the question as stated, we agree with counsel for plaintiffs that upon a demurrer to the evidence of plaintiffs the court cannot weigh conflicting evidence, but must accept as true the part of it favorable to plaintiffs which tends to prove their case. This rule is stated in varied language in *Zumbrun v. City of Osawatomie*, 130 Kan. 719, 288 Pac. 584, and *In re Estate of Bond*, 158 Kan. 776, 150 P. 2d 343, and in the many cases referred to therein. The recognition of this rule, which we regard as being applicable both to the trial court and to this court, is the reason or excuse for setting out hereinbefore the evidence offered

on behalf of plaintiffs in the trial court. This has been taken not only from the abstracts of counsel, but from the transcript of testimony and exhibits introduced at the trial. We trust we have omitted nothing regarded as essential to plaintiffs' cases. Parts of the evidence will be referred to later. We concur, also, in the suggestion made in the brief for plaintiffs that there is but little conflict in the evidence in this case. Naturally, the pleadings and evidence pertaining to the cases differ as to the names of the parties-plaintiff, as to particular projects to be constructed, and to the different steps taken by the plaintiffs, but, generally speaking, the plaintiffs relied upon the same grounds for the cancellation of their contracts, with a few exceptions noted in the evidence, but these were of the same general character.

We may disregard, also, that part of the question involved as stated referring to judgment for plaintiffs for the work performed and materials supplied, for with respect to those matters we understand the parties have stipulated. Also we understand it to be conceded, any question of accounting of sums due plaintiffs for partially completed work cannot be considered, either under the pleadings or the stipulation, unless the court decrees the cancellation of the contracts.

The real question in this case is whether, under the rules of law applicable thereto, the court would have been justified in cancelling the contracts, regarding all the evidence given on plaintiffs' behalf as being true.

This leads us first to a consideration of the contracts themselves. Both the pleadings and the evidence disclose that each of the contracts in question was one by which the plaintiff, for a stated consideration, agreed to construct a described road-buildng project and to pay for the necessary materials and labor. It contained no provision excusing performance. The contracts were let upon competitive bidding. Plaintiffs bid voluntarily. There is no claim upon the part of any plaintiff of any fraud or mistake or of any overreaching or concealing in the making of the contract. The plaintiffs were experienced contractors, familiar with the form of the contract, with the practice of defendant in the letting and completion of such contract, and each of them gave a surety company bond for its faithful performance.

Plaintiffs in their petitions alleged:

"The contracts provide for a limited time for completion. Completion time has long since expired."

This allegation was specifically denied by defendant in its answers. All of each contract was in writing, although the writing consisted of several papers. The construction of those instruments to determine their meaning on this point was first for the trial court and now for this court. An examination of these written instruments discloses that plaintiffs' contention on this point is not well taken. In submitting the bid each of the plaintiffs stated in the proposal the number of "working days" for performing the work provided for by the contract. There was no reason for him to state a smaller number of days than he would think ample in which to do the work, and there is no contention that any of them did so. Under his contract he need not start to work until ten days after he received a work order, which under his contract was simply a notice that he might begin work. It was defendant's practice not to give this notice until the situation was such that the work could be started. For example, one who had a surfacing job could not start on the work until the grading was done. Plaintiffs knew that when they made their bids, and no complaint is made of that practice. Also it was the practice for the notice not to be given until a plaintiff was in a situation that he could go to work. At the time the contracts here involved were executed most of the plaintiffs had other unfinished contracts with defendant and were not in position to start work on the new contracts immediately. When it was possible for the work to be done and the plaintiff was ready to go to work on the new contract defendant would issue the "work order." These practices were well known to plaintiffs and they do not complain of them. After plaintiffs started to work on their contracts they would make weekly reports of the days they had been able to work, and defendant would keep account of the number of working days used. But the contract did not provide for counting any day as a working day unless it was one upon which the contractor could "physically and legally prosecute the work." The contract fixed no "limited time for completion" of the contract, and no such time had expired when these actions were brought. The only limitation of time was the number of working days fixed by a plaintiff, computed after he was on the work and had days when he could practically and legally prosecute the work. It is not contended on behalf of any of the plaintiffs that such time had expired.

The result of the analysis of the written contracts is that the instruments making up the contract constituted a definite agree-

ment to complete the work described therein within the time as above computed.

There is no contention here that the contracts were not valid when they were made; neither is there any contention that they were not fairly and intelligently made.

The principal question stated by appellants as being involved is whether contracts, valid when made, later became invalid because of impossibility of performance due to war conditions. It is well settled that war conditions standing alone do not invalidate executory contracts between parties of one of the nations engaged in war. See 67 C. J. 349, where the rule is stated thus:

"The right of persons resident in the same nation to contract between themselves, and the validity of their contracts, is not affected by the outbreak or existence of war between such nation and another unless performance of the contract will necessarily give aid or comfort to the enemy, in which case it is void as to all acts to be done during the war."

In 17 C. J. S. 953, it is said:

"In the absence of a statute to the contrary, conditions arising from a state of war in which this country is engaged will not ordinarily constitute an excuse for nonperformance of contract; and impossibility of performance arising from the acts of the legislature and the executive branch of government in wartime does not, without more, constitute an excuse for nonperformance. . . ."

In 27 R. C. L. 918, under the heading, "War as Excusing Breach of Contract," it is said:

"The general rule is that in the absence of a stipulation in a contract relieving a party in case of war, the existence of a state of war is no excuse for a breach of the contract, whether the contract is concluded before or after the commencement of hostilities, and without regard to the increase in expense or difficulty of performance which it entails. . . ."

Authorities are cited in support of the above texts.

Indeed, a condition of war does not render invalid such contracts between parties of the warring nations unless their prosecution would require communication with or in some material matter give aid to the enemy. They may be of such a character that they simply lie dormant for the period of the war. (See *Fisher v. Krutz and Campbell,* 9 Kan. 501; *State, ex rel., v. Reardon,* 120 Kan. 614, 245 Pac. 158.)

Counsel for appellants argue that the materials with which the contracts were to be performed were taken by the government, and the contracts thereby became invalid. Mr. Ballard testified that

cement was available for highway projects until about the middle of the summer of 1942, when airports in this area became so numerous that the cement companies agreed to furnish all the material to the War Department. Other witnesses testified that cement became available in the summer of 1943 and since then has been plentiful, and that the price has not increased. Mr. Ballard testified that in 1941 form lumber represented about seven percent of the cost of constructing culverts, and about six percent of the cost of building bridges. It was not used for paving or grading contracts. That by 1944 the cost of form lumber increased 100 percent, and in the early spring or summer of 1942 it became impossible to obtain. Just how much it delayed the contracts here involved is not clear. The evidence was that form lumber may be used more than once, until it gets split or deteriorates in quality. Mr. Ballard further testified that with bridges of steel superstructure structural steel for girders and I beams and plates form an essential part of each of the bridges involved in the contracts; that it was one of the first things taken off of highway construction and became impossible to get, and was not available at the time of trial. Reinforcing steel appears to have been available at all times. When the situation arose, defendant tried to help plaintiffs get the materials and was successful as to some items. In one case its engineers redesigned the bridge with the view of building it with available materials, and asked plaintiff to submit figures upon the cost of the redesigned structure. The evidence does not show that this was done. Defendant further advised all the plaintiffs that it regarded inability to have their orders filled for certain materials was a temporary matter and that in such situations they might suspend work until the materials were available. In some cases specific orders temporarily suspending work were issued. The contracts specifically authorized defendant to take that position and to issue such orders. (Art. 8.5 of Standard Specifications.) It was plaintiffs' duty under their contracts to furnish the materials for the projects. It was their duty also to conform to reasonable temporary suspension orders of defendant. Plaintiffs did not object to them when they were made, months before these actions were brought. Indeed, they do not object to them in the actions brought, but do plead unavailability of certain materials at the time they were wanted as grounds for cancellation of the contracts. Clearly, that is no reason for the cancellation of the contracts.

Plaintiffs pleaded the preference-rating orders of the Office of Production Management of September 23, 1941; October 18, 1941, and August 18, 1942, fixing a priority rating of A-7 on certain materials for highway construction, and the order of December 24, 1942, revoking those ratings and preventing certain types of highway construction. This last is referred to herein as a "stop order." These orders show that they were issued for the purpose of facilitating the acquisition of materials for the construction of federal defense projects and contained language definitely showing that they were temporary in their nature. Defendant conceded these orders had been made.

Plaintiffs stress the stop order of December 24, 1942, as being an effective barrier to the completion of their contracts. Under the evidence it did not have the effect of stopping the work in any of the cases. It did not apply to the contract in any of the cases in which Tucker and McCoy, Reno, Taylor, List and Clark, Cook, Tucker & McCoy, Stannard Construction Co., and Hulme were plaintiffs. In the cases to which the stop order was applicable plaintiffs had stopped the work for other reasons some months prior to its effective date. Freeto stopped work on one bridge October 11, 1941, and on the other December 6, 1941. Geiger *et al.* stopped work May 21, 1942, Bennett September 17, 1942, Hansen April 11, 1942, Jones May 4, 1942, and Rhoades December 7, 1941, upon one contract, and the other two were never started. So it cannot be contended that the work on any of the contracts was stopped by reason of this stop order. It is true that some of the work could not have gone on after that date until the stop order was lifted or modified. In the Bennett case, upon application made as provided for in the stop order, it was lifted in 1943 so as to permit the completion of a part of the work. The evidence does not disclose that any other plaintiff attempted to take advantage of the provision in the stop order by which authority to complete a specific project might be granted. At the time of the trial the stop order of December 24, 1942, had not been fully lifted. Defendant in its brief here advise that it had been lifted before the argument in this court, but we give that fact no force except as it further confirms the view that all priority regulations were designed to operate only for a limited time.

Furthermore, plaintiffs are in no position to complain of any of those orders of the federal government, for by their contract (Art.

7.1, Standard Specifications) they agreed to observe and comply with all existing or later enacted federal laws, orders and regulations affecting the conduct of the work.

Plaintiffs argue that they were prevented from completing these contracts because their equipment was taken by the government. The pertinent portion of the statute (U. S. C. A., Title 50, § 721), pleaded by plaintiffs, reads as follows:

"Whenever the President, during the national emergency declared by the President on May 27, 1941, but not later than June 30, 1945, determines that (1) the use of any military or naval equipment, supplies, or munitions, or component parts thereof, or machinery, tools, or materials necessary for the manufacture, servicing, or operation of such equipment, supplies, or muni-, tions is needed for the defense of the United States; (2) such need is immediate and impending and such as will not admit of delay or resort to any other source of supply; and (3) all *other means of obtaining the use of such property for the defense of the United States upon fair and reasonable terms have been exhausted,* he is authorized to requisition such property for the defense of the United States upon the payment of fair and just compensation for such property to be determined as hereinafter provided, and to dispose of such property in such manner as he may determine is necessary for the defense of the United States. . . ." (Italics supplied.)

It will be noted that while this statute authorizes requisition it clearly limits the use of that authority until other means of obtaining the property upon fair and reasonable terms have been exhausted. The testimony in this case is that no property was requisitioned. The plaintiffs voluntarily executed contracts with the proper authorities of the federal government. It is true Mr. Pine testified that they were invited and urged to make such contracts and that there was a hint the equipment might be requisitioned. Some of the plaintiffs did not have to be urged to make the contracts, and in fact spent time doing so which they could have used to good advantage on their contracts with defendant. Others were reluctant to leave their contracts with defendant, and most of them did finish up contracts with defendant which are not here involved. When this work started defendant sent a letter to each of the contractors, the substance of which is set out in the testimony in *Rhoades v. The Commission.* Defendant took the position that it had no objection to plaintiffs taking defense work, but did want pending contracts finished, and if that could not be done before the commencement of defense work that it should be done afterwards, and asked plaintiffs to come in and have a definite understanding about it. Most of them did so, and agreed orally to come

back and finish their contracts, the work on their pending contracts with defendant to be suspended while they worked on defense work.

Plaintiffs further argue that the government took their employees for armed service. The testimony was that plaintiffs' employees who were subject to the draft were taken, presumably if physically fit, but that many of the employees were not subject to the draft, particularly those who had been with plaintiffs as their key men for several years. Neither of these facts would authorize or justify the cancellation of the contracts here involved. The testimony further showed that some of plaintiffs' employees quit work and took defense jobs at higher pay, but Mr. Franzke testified that in 1942, before a workman quit work for one of the plaintiffs for that reason, the man power regulations required that he get a release. Under plaintiffs' contracts with defendant it was their duty to provide their equipment and their help. Any interruption in that matter shown by the evidence did no more than temporarily delay or interfere with the completion of the work. Some stress is placed upon Mr. Franzke's letter to Mr. Ballard of November, 1943, and his testimony to the effect that it would not be possible for his office to furnish at that time a thousand men for highway work. His testimony disclosed that was a temporary situation. Some years prior thereto his office had had more persons calling for work than could be supplied jobs.

Plaintiffs cite an excerpt from the opinion in *Texas Co. v. Hogarth Shipping Co.*, 256 U. S. 619, 41 S. Ct. 612, 65 L. Ed. 1223, as follows:

". . . Where parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and availability, the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties be excused from performing it."

This excerpt is cited in Williston on Contracts (Rev. ed., p. 5423) and the reasons stated are criticized, and the author says:

"In truth the foundation is the same as in the case of mistake; the two defenses are substantially identical in principle, and often the same situation will involve both. As the basis for the defense of mistake is the presumed assumption by the parties of some vital supposed fact, so the basis of the defense of impossibility is the presumed mutual assumption when the contract is made that some fact essential to performance then exists, or that it will

exist when the time for performance arrives. The only evidence, however, of such mutual assumption is, generally, that the court thinks a reasonable person, that is, the court itself, would not have contemplated taking the risk of the existence of the fact in question.. . . ." (p. 5424.)

The reasoning is criticized also by the annotator in 137 A. L. R., page 1217, where it is said:

"In applying this doctrine the courts disclaim any assumption of power to absolve the promisor on the ground that to require performance is inequitable, but assume merely to give effect to an implied term of the contract that the situation with reference to which it was made shall remain essentially unchanged.· The attractiveness of this doctrine lies in its appearance of even-handed justice. It is, however, open to grave objection as departing from the simple and certain rule that the parties' relative claims upon and duties in respect of each other are conclusively fixed and defined by the terms of their own written contract, and as substituting therefor an inquiry, necessarily speculative, into the mental reservations with which the parties made their bargain. To entertain such a doctrine is to substitute uncertainty for certainty, and to create rather than to avoid the necessity of litigation."

We shall not attempt to decide, or even to debate, the merits of the reasoning in the opinion or of the criticisms of it. We observe that it is not the function of courts to make contracts; rather it is their function to enforce them as made. (See the many cases digested under "Contracts," Key No. 143, Am. Dig.) We note also that plaintiffs do not predicate their actions upon any claim of mistake at the time of their execution. In fact, in the proposal each declared he had examined the plans, specifications, form of contract, had inspected the location of the work, the local sources of supply, and "satisfied himself as to all quantities and conditions, and understands that in signing this proposal he waives all right to plead any misunderstanding regarding the same."

In 17 C. J. S. 954, it is said:

"Nonperformance may be excused by reason of an implied condition in the contract . . . Such is the case where it appears from the contract that the parties knew and contemplated that its fulfillment would be dependent on the existence at the time for performance of certain things or conditions essential to its execution. . . . There is no implied stipulation that performance shall be relieved against by the difficulties occasioned by the outbreak of war."

It is clear from the pleadings and evidence of plaintiffs that they predicate their actions upon the principle contained in the excerpt in the case of *Texas Co. v. Hogarth Shipping Co.*, supra, and the quotation last above made, namely, that the parties contemplated the fulfillment of the contracts with defendant upon situations

existing at the time the contracts were made and did not take into account difficulties arising from our nation entering into the war, and that therefore the objects had in mind by the parties at the time of the making of the contracts were frustrated by the subsequent events incident to our participation in the war. Plaintiffs' evidence does not support that view. We had that question specifically before us in the recent case of *Berline v. Waldschmidt,* 159 Kan. 585, 156 P. 2d 865, where the controlling rule was announced as follows:

"The doctrine of commercial frustration is predicated upon the premises of giving relief in a situation where the parties could not reasonably protect themselves by the terms of a contract against the happening of subsequent events, but it has no application to a situation where the event that has supervened to cause the alleged frustration was reasonably foreseeable and could and should have been controlled by provisions of such contract." (Syl. ¶ 2.)

There are a number of other cases supporting the rule there stated. We do no more than cite a few of them:

*Primos Chemical Co. v. Fulton Steel Corporation,* 266 Fed. 945; *Maxwell v. United States,* 3 F. 2d 906; *Carnegie Steel Co. v. United States,* 240 U. S. 156, 36 S. Ct. 342; *Day v. United States,* 245 U. S. 159; *Columbus Ry. & Power Co. v. Columbus,* 249 U. S. 399, 39 S. Ct. 349; *Lloyd v. Murphy,* 25 Cal. 2d 48, 153 P. 2d 47; *Clark & Co. v. Miller,* 154 Miss. 233, 122 So. 475; *Home Builders v. Busk,* 106 Neb. 86, 182 N. W. 589; *Gordon v. State of New York,* 233 N. Y. 1, 134 N. E. 698; *Indemnity Co. v. Commissioners,* 107 Ohio St. 51, 116 N. E. 672; *Thompson & Stacy Co. v. Evans, Coleman & Evans,* 100 Wash. 277, 170 Pac. 578.

The evidence in this case will not support plaintiffs' position. On the other hand, it is to the effect that as early as 1939 both the National and the State Contractors Associations recognized war conditions in Europe and saw the importance of having an appropriate clause inserted in contracts of this kind by which the contractors might be given some relief from hardships and increased prices which might be incident to this nation being engaged in the war then prevailing in Europe. They undertook to get such a clause embodied in such contracts, without success. In the case of *Berline v. Waldschmidt,* supra, facts were stated from which the court concluded that one contracting as early as May, 1939, was bound to take cognizance of the turbulent conditions in Europe which might involve the rights of persons executing contracts in

this country. The contracts here involved were executed on various dates from May 14, 1941, to March 23, 1942, during all of which time the war conditions and our own attitude toward them had grown much worse than they were early in 1939. By the exercise of our authority to take judicial knowledge of historical matters we might enlarge in detail upon those conditions, but we think the evidence of Mr. Ballard in particular and of other witnesses disclosed the situation sufficiently. Testimony disclosed that meetings of the Contractors Association were held at various places in 1939, and since, to discuss matters pertaining to war conditions important to contractors. The evidence in behalf of each of the plaintiffs disclosed that they recognized those conditions and kept in touch with them through their Contractors Association and the information Mr. Ballard had in his office, which was available to them, and that notwithstanding all this they voluntarily bid upon the projects involved and executed contracts which, as we have previously noted, contained no clause excusing performance for any reason. Hence, even if we agreed with the questionable doctrine that courts should in some circumstances read into a contract such a clause, the evidence here would not authorize or justify such a ruling.

Respecting impossibility of performance of a contract after it has been executed, the authorities note that there is a difference between "the thing cannot be done" and "I cannot do it." (Restatement of Contracts, § 455, comment 1.) The first of these is referred to as objective and the second as subjective. The same distinction is made in Williston on Contracts (Rev. ed.), pp. 5411-12. Both authorities agree that the second statement, "I cannot do it," never relieves the promisor, the reason being that the promisor has agreed and definitely bound himself to perform, and cannot be heard to say otherwise. This principle eliminates, so far as establishing the cases of the plaintiffs is concerned, all of the evidence offered to the effect that plaintiffs do not have equipment, or repairs for equipment; that they do not have materials; that they do not have their crews, or their men, and the like. If plaintiffs should establish their cases at all, the evidence must be to the effect that the contracts cannot be done by anyone. The evidence fails to establish that fact. The most it establishes is that some parts of it could not be done at a particular time—not that it could not be done at all.

In Williston on Contracts, *supra*, § 1963, it is said:

"The fact that by supervening circumstances performance of a promise is made more difficult and expensive . . . will ordinarily not excuse the promisor."

There are many authorities to support the text.

Some of the plaintiffs put the additional expense as a reason for unwillingness to complete the contracts; others did not. But we need not pursue that further since plaintiffs in their reply brief state:

"We wish it made clear to the court that we are not contending that increased prices or increased hardships are justification for the cancellation of a contract."

Plaintiffs point out that the witnesses all testified that they would not have entered into the contracts in question if they had known that performance could not have taken place in three or four years, because they could not anticipate prices and other matters to be considered that far in the future. Much of the delay has resulted from voluntary acts of plaintiffs—these actions were brought about two years ago. When additional cost and inconvenience go out of the cases these matters necessarily go out also. In addition to that, plaintiffs' contracts are not to be interpreted from what plaintiffs say three or four years after they were executed as to whether they would or would not have made them. They did make them, and their rights and duties are determined by the contracts themselves.

In our cases in which impossibility of performance was pleaded, and which are comparable to those here considered, cancellation was not decreed. In some of them performance was required; in others the promisee was held to be entitled to damages. We do no more than list them: *Hampe v. Sage*, 87 Kan. 536, 125 Pac. 53; *Hurless v. Wiley*, 91 Kan. 347, 137 Pac. 981; *Carter v. Wilson*, 102 Kan. 200, 169 Pac. 1139; *Drug Supply Co. v. Board of Administration*, 106 Kan. 256, 187 Pac. 701; *Winfrey v. Automobile Co.*, 113 Kan. 343, 214 Pac. 781; *Wilson v. National Refining Co.*, 126 Kan. 139, 266 Pac. 941; *City of Topeka v. Industrial Gas Co.*, 135 Kan. 646, 11 P. 2d 1034; *International T. & R. Corp. v. Benscheidt*, 141 Kan. 416, 41 P. 2d 737.

This opinion is of unusual length because thirteen separate actions are presented together; the sustaining of the demurrer to the evidence required us to examine it to see if any of it would sus-

tain plaintiffs' causes of action, and the arguments of counsel took a wide range, extended somewhat by our own research. We have endeavored to decide these cases without writing a thesis on the law of the impossibility of performance of contracts, with the consideration of all questions relating thereto. Those interested will find excellent treatment of the subject in the law encyclopedias and textbooks on contracts and the many cases cited therein.

From our study it seems clear that the ground relied upon by plaintiffs is insufficient to require or authorize the cancellation of the contracts, and that the ruling of the trial court in sustaining defendant's demurrer to plaintiffs' evidence was correct and should be affirmed. It is so ordered.